[Crim. No. 43356. Second Dist., Div. Five. Aug. 23, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
NATHANIEL GREEN, Defendant and Appellant.

COUNSEL

Craig Robinson and Howard Beckler for Defendant and Appellant.

John K. Van de Kamp, Attorney General, William R. Pounders and Timothy E. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HASTINGS, J.—After waiving a jury trial, appellant was convicted of one count each arson of an inhabited structure (Pen. Code, § 451, subd. (b)) and arson of property (Pen. Code, § 451, subd. (d)). Appellant's motion for a new trial was denied, and he was sentenced on count I to the low term of three years in state prison. A two-year sentence on count II was stayed (Pen. Code, § 654). In his brief on appeal, appellant asserted the following grounds of error: (1) His jury trial waiver was procured by fraud on the part of the district attorney; (2) evidence of a prior uncharged offense was improperly admitted; (3) his warrantless arrest was illegal and therefore his subsequent statements to the police should have been suppressed; and (4) the evidence was insufficient to sustain the conviction.

At oral argument and in a subsequent letter brief, appellant raised the issue of primary concern to us here: whether the arson of an unoccupied unit in an otherwise occupied apartment building is "arson of an inhabited structure" within the meaning of Penal Code section 451, subd. (b). We hold that it is, and affirm the conviction.

FACTS

Appellant was convicted of starting a fire in an apartment in which his estranged wife, Patricia Green, had been living. The fire occurred at approximately 4 a.m. on February 19, 1981. Ron Barry, who lived with Donna Lem in the apartment adjacent to Mrs. Green's, testified that on that date, at approximately 12:30 a.m., he saw a male Negro fitting appellant's description walk along a dirt path at the side of the apartment building and stop in the carport area. When Barry walked outside to investigate, the man disappeared.

Karen Jolicoeur, who lives across the street from the apartment building, was walking her dog at approximately 2:30 a.m. on February 19 when she saw appellant walking in the carport area. He was wearing dark clothes and had a small can in his hands. Appellant was looking up at the apartments,

and was ducking behind the cars. He appeared to be drunk, as he was staggering and mumbling to himself. Jolicoeur watched appellant for approximately 20 minutes, until he disappeared down the hallway that leads to the apartment courtyard. Although she had seen him there on other occasions and had called the police, she did not call the police this time.

Around 4 a.m., Ron Barry heard a small explosion and smelled smoke. He went down to the carport area and saw flames and smoke falling from the carport overhang. The flames were coming from Pat Green's apartment. Barry shouted a warning then tried to get his and Donna Lem's cars out of the carport. Ms. Lem's car, which was parked in Patricia Green's parking space, caught fire as Barry was trying to remove it, and was eventually destroyed.

After the fire, Karen Jolicoeur, suspecting that appellant was responsible, told the apartment manager and the police that she had seen appellant at the apartment that night.

Los Angeles Fire Department arson investigator James Wolfe testified that in his opinion the fire in Mrs. Green's apartment was deliberately set. The fire started in the dining room area and burned through the floor (which was the roof of the carport). The burn pattern was characteristic of a fire started with a flammable liquid.

After a two-week investigation during which he interviewed several witnesses, Officer Wolfe decided to arrest appellant, and went to appellant's home in Lakeview Terrace for that purpose. When appellant answered the door, Wolfe asked him to step outside so that they could talk. After a brief conversation, he placed appellant under arrest. Appellant told the police that he was a security guard for Wells Fargo and was working on the night of February 18-19; Wells Fargo records showed that appellant was off that night.

Also testifying at appellant's trial were Donna Lem and David Church. Ms. Lem testified that she and Mrs. Green worked together from July 1980 until February 1981. Mrs. Green worked nights, usually arriving home around 11:45 p.m. On February 15, 1981, four days before the fire, Patricia Green moved to England.

David Church, another tenant of the Vanowen apartment complex, met appellant during the summer of 1980, when he was introduced to appellant by Mrs. Green. Church testified that appellant told him he was a member of the "arson squad" in the Air Force, although appellant denied this and testified that the Air Force did not even have an "arson squad."

Some time during the summer of 1980, Church went down to the carport area to empty his trash and saw appellant with his head inside the storage cabinet beneath Mrs. Green's apartment. Appellant ran when he saw Church. Church started to return to his apartment when he smelled smoke, and saw that the storage cabinet was on fire. He got a fire extinguisher and opened the cabinet door, whereupon he saw a plastic bottle which was burning and rapidly melting down. When he attempted to extinguish the fire with the extinguisher, the flames "shot out all over the place." Church, a mechanic who had experience with gasoline fires, testified that this was characteristic of a gasoline-type fire. Church was also on the scene for the February 19, 1981 fire, which he helped extinguish. He testified that he smelled a gasoline-type odor in Patricia Green's apartment.

Appellant testified in his own behalf. He denied setting either the 1980 or February 1981 fires, stating that he had spent 20 years in the Air Force as a fireman and had been "putting out fires all his life." After retiring from the Air Force, he worked for the Palmdale Fire Department in crash rescue. At the time of the February 19th fire, he was working as security officer for Wells Fargo Security.

Although he and Patricia Green separated in 1980, they continued to see each other and were on friendly terms, although he never went into Mrs. Green's apartment due to problems with her son. Appellant claimed that he knew Mrs. Green was leaving the country, and in fact he was supposed to meet her in England.

When questioned during cross-examination, appellant denied having threatened Mrs. Green. In rebuttal, David Church testified that he had overheard several arguments between the Greens. On one occasion, when everyone was sitting around the apartment pool and appellant, in Church's opinion, had had "a few too many," appellant told his wife, "If you don't shut up, bitch, I'm going to kill you."

## DISCUSSION

■ 1. Appellant claims that the prosecutor "defrauded" him into waiving a jury trial because his decision was based upon the state of the evidence at that time, which evidence did not include the testimony of David Church. He implies that the prosecutor concealed the fact that Church would testify in order to induce the waiver.

This serious charge is totally without support in the record. It is apparent that the prosecution located Mr. Church on the second day of trial, and immediately notified the defense of Church's availability and anticipated

testimony. Defense counsel indicated that he had been caught somewhat off guard by the sudden appearance of Mr. Church, but no mention was made of any "fraud" or other impropriety on the part of the prosecutor. Instead, appellant waited until after he was convicted, then raised the issue of fraud in a motion for new trial. Having thus impugned the prosecutor's integrity, appellant proceeded, in the motion for new trial, to refute his own claims by way of a supporting declaration by defense counsel, who stated: "As the Court knows, *neither Mr. Mireles or [sic] myself were aware of the existence of Mr. Church prior to the trial,* and it was only during trial that his identity became known. Had I known about any evidence concerning prior fires as testified to by Mr. Church, there would not have been a jury waiver." (Italics added.)

Even if, as appellant claims, he based his jury waiver on the state of the evidence at that time, he has not set forth any facts to support his claim that the waiver resulted from his being "misled" by the prosecutor. "Defendant should not be allowed to waive a jury trial, take his chances before a trial court, and then when he finds himself dissatisfied with the result, be allowed to predicate error upon . . . [a] vague possibility of misunderstanding." (*People* v. *Langdon* (1959) 52 Cal.2d 425, 433 [341 P.2d 303].)

■ 2. Appellant next contends that the court erred in admitting evidence of the storage unit fire which occurred during the summer of 1980.

■ As a general rule, evidence of prior uncharged offenses is inadmissible when offered solely to prove the defendant's disposition or propensity to commit the crime charged. However, " '[w]hen . . . a primary issue of fact is whether the defendant—rather than some other person—committed the charged offense, evidence of uncharged offenses is ordinarily admissible if it discloses a distinctive modus operandi common both to the charged and uncharged offenses . . . . A modus operandi gives rise to a reasonable inference that the charged and uncharged offenses were committed by the same person when the marks common to those offenses set them apart from other offenses of the same general variety.' " (*People* v. *DeRango* (1981) 115 Cal.App.3d 583, 588 [171 Cal.Rptr. 429], citing *People* v. *Matson* (1974) 13 Cal.3d 35, 40 [117 Cal.Rptr. 664, 528 P.2d 752].)

■ In determining whether evidence relating to a prior uncharged offense should be admitted to show a "common design or plan" (Evid. Code, § 1101, subd. (b)) the court must look at " ' 'whether there is some clear connection between [the prior] offense and the one charged so that it may be logically inferred that if defendant is guilty of one he must be guilty of the other. Or as the matter is sometimes stated, the other offenses . . . are sufficiently similar and possess a sufficiently high degree of common fea-

tures with the act charged where they warrant an inference that if the defendant committed the other acts he committed the act charged. . . .'" (*People* v. *Thomas* (1978) 20 Cal.3d 457, 465 [143 Cal.Rptr. 215, 573 P.2d 433].) ▉ Here, the trial court correctly concluded that there were "strong unifying factors" between the two incidents. The most obvious of these is that Mrs. Green's apartment was clearly the target of both fires. Both fires were deliberately set, using a flammable liquid which appeared to be gasoline. In each instance, appellant was in the area at or near the time the fires broke out. These factors establish a clear connection between the 1980 fire and the one in issue here.

▉ 3. Appellant next claims that his arrest without a warrant violated *People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333], and thus his subsequent statements to police (presumably those to the effect that he was working on the night of the fire) should have been suppressed.

In *Ramey,* the Supreme Court held that a warrantless arrest inside the arrestee's home is per se unreasonable. The only two exceptions to this rule (which concededly were not present here) are (1) where there are exigent circumstances, or (2) where the arresting officers have consent to enter the residence.

Appellant's reliance on *Ramey* is misplaced, since the arrest took place outside his home. "The privacy interests protected by *Ramey* were satisfied when appellant voluntarily stepped outside. Once he stepped outside, it was lawful for the officer to arrest him on probable cause. . ." (*People* v. *Tillery* (1979) 99 Cal.App.3d 975, 979-980 [160 Cal.Rptr. 650].)

▉ 4. Appellant's claim that his conviction is unsupported by the evidence is also without merit. ▉ Under the well-established principles of appellate review, we " 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].)

▉ "[T]he very nature of the crime of arson ordinarily dictates that the evidence will be circumstantial." (*People* v. *Beagle* (1972) 6 Cal.3d 441, 449 [99 Cal.Rptr. 313, 492 P.2d 1].) Some of the factors upon which courts have relied in affirming arson convictions are motive, evidenced by a threat; prior presence in the building; possession of inflammatory materials; presence in the vicinity at the time of the fire; lack of evidence of natural or accidental cause but evidence of intentional (incendiary) cause; and more than one fire with temporal and spatial proximity. (*Id.* at pp. 449-450.) All

of these factors were established here by both direct and circumstantial evidence.

■ 5. Citing *People* v. *Cardona* (1983) 142 Cal.App.3d 481 [191 Cal.Rptr. 109], appellant argues that because Mrs. Green had vacated her apartment several days before the fire, the apartment was not "inhabited" at the time of the fire and therefore he should not have been convicted of "arson of an inhabited structure."

In *Cardona,* the defendant was convicted of first degree burglary, that is, "burglary of an inhabited dwelling house." (Pen. Code, § 460.) As it turned out, the occupants of the home had moved out the day before, and caught the defendant redhanded when they returned to retrieve some of their belongings. The court held that because the victims had moved and no longer intended to use the house as their dwelling, the house was not "inhabited," in other words, not "currently being used for dwelling purposes, whether occupied or not." (Pen. Code, § 459.) The court then reduced the defendant's conviction to second degree burglary.

*Cardona,* however, is inapplicable here. Appellant was convicted of arson under Penal Code section 451. That section provides that "[a] person is guilty of arson when he willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of, any structure, forest land or property." Section 451, enacted in 1979, replaced former sections 447a through 450a. Under former section 447a a defendant convicted of arson of (among other things) a "dwelling house" could look forward to a term of "not less than two or more than 20 years" in state prison. Consistent with the purpose of the determinate sentencing law, which is that punishment be "fixed by statute in proportion to the seriousness of the offense" (Pen. Code, § 1170), section 451 fixes the terms of imprisonment for various degrees of arson according to the injury or potential injury to human life involved: "arson that causes great bodily injury" (§ 451, subd. (a)), five, seven or nine years in state prison; "arson that causes an inhabited structure . . . to burn" (§ 451, subd. (b)), three, five or seven years; "arson of a structure or forest land" (§ 451, subd. (c)), two, four or six years; and "arson of property" (§ 451, subd. (d)), 16 months, two or three years.

Section 451 also substituted the words "inhabited structure" for the term "dwelling house" used in former section 447a. Section 450, subdivision (d) defines "inhabited" as "currently being used for dwelling purposes, whether occupied or not"; this is the same definition used in the burglary statute, Penal Code section 459. "Structure," defined in section 450, subdivision

(a), includes "any building." This deliberate and careful choice of language indicates a "manifest legislative intent to provide more stringent punishment for the narrow category of crimes against property which involves the deliberate attempted or actual burning of buildings likely to be inhabited, because of the obvious danger to human life attendant thereon." (*People* v. *Earnest* (1975) 53 Cal.App.3d 734, 748 [126 Cal.Rptr. 107].)

Viewed in this context, the words "inhabited structure" in section 451, subdivision (b) must be read together; any other interpretation produces an absurd result. Appellant was convicted of "arson of an inhabited structure" because he started a fire in a large apartment building, thus endangering the lives of all of the building's occupants. Yet he argues in effect that the timely departure of his estranged wife makes his act less blameworthy. This is contrary to public policy and contrary to what the Legislature intended when it enacted section 451.

■ Also without merit is appellant's contention that his conviction on count II (arson of property with respect to Donna Lem's car) should be reduced to a violation of Penal Code section 452[1] because the burning was "reckless" and not "willful and malicious" as required by section 451. "Willful" means "intentional," and "'malice' denotes nothing more than a deliberate and intentional firing of a building, or other defined structure, as contrasted with an accidental or unintentional ignition thereof; in short, a fire of incendiary origin." (*People* v. *Andrews* (1965) 234 Cal.App.2d 69, 75 [44 Cal.Rptr. 94].) Here, the fire was set "willfully and maliciously," and the fact that some of the resulting damage may have been unintentional is irrelevant.

The judgment of conviction is affirmed.

Feinerman, P. J., and Stephens, J., concurred.

---

[1]Penal Code section 452 provides that "[a] person is guilty of unlawfully causing a fire when he recklessly sets fire to or burns or causes to be burned, any structure, forest land or property . . . . [¶] (d) Unlawfully causing a fire of property . . . is a misdemeanor.