[No. H021243. Sixth Dist. July 26, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK STANISLAW MUSZYNSKI, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to rules 976(b) and 976.1 of the California Rules of Court, the opinion is certified for partial publication with the exception of parts III, V, VI, and VII.

COUNSEL

J. Frank McCabe, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Eric D. Share and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WUNDERLICH, J.—

## I.  Statement of the Case

Defendant Mark Stanislaw Muszynski appeals from a judgment entered after a jury convicted him of aggravated child endangerment (Pen. Code, § 273a, subd. (a)),[1] attempted murder (§§ 187, 664), and aggravated arson (§ 451.5, subd. (a)(3)) and found that he inflicted great bodily injury on the child (§§ 1203, subd. (e)(3), 12022.7, subd. (a)).[2] On appeal he claims the trial court erred in denying a continuance so he could be represented by retained counsel or represent himself. He claims defense counsel was incompetent for not requesting an instruction on voluntary intoxication. He claims there is insufficient evidence to support the convictions for attempted murder and aggravated arson. He also claims the court erred in failing to appoint new counsel for the purpose of filing a motion for new trial on the ground of ineffective assistance of trial counsel.

We conclude that there is insufficient evidence to support the conviction for aggravated arson, reverse the judgment, and remand for resentencing.

## II.  Facts

The primary witness against defendant was Anna Owczarska. At the time of trial, she was in custody for having left a drug treatment program. She admitted having a prior misdemeanor conviction for auto theft. She testified that in 1998, she was living with her baby daughter and defendant in an apartment on Magliocco Drive in San Jose. She said he hit her and would disconnect the phone and once pulled a knife on her. He also told her he had

---

[1]All further statutory references are to the Penal Code unless otherwise specified.
[2]Defendant was acquitted of a second count of attempted murder.

hired somebody to kill her and that she would not live to her 22d birthday on February 25, 1999.[3]

Owczarska testified than on February 5, 1999, she and defendant smoked crack cocaine and argued. Later, she left to buy some baby formula, leaving defendant angry and alone with the baby. Owczarska first drove to see her mother, Renata Pilichowski, and her husband, Wieslaw, to ask them for money. They had none to give her so she went to a friend's house to smoke some more crack. From there, she drove to a store to buy formula. When she returned home, she found the front door lock jammed with a piece of metal. She knocked, but no one answered. The windows were also locked. After a while, she freed the lock and opened the door. Inside, she smelled gas and noticed that everything was dark and closed up, even the bathroom window, which was usually kept open.

When Owczarska mentioned the smell of gas to defendant, he grabbed the baby, handed her to Owczarska, and told her to leave. However, Owczarska put the baby down and decided to have a cigarette. Defendant told her not to light it "cause the house is going to blow-up." He then went into the bathroom. Owczarska lit her cigarette, and the apartment exploded.

Owczarska screamed, defendant grabbed the baby, and the three fled. As they drove away, defendant told her he was trying to kill himself. He told her not to tell the police because they would think he was crazy.[4] They did not go to the hospital for fear that defendant might be arrested on outstanding warrants and instead drove to a friend's apartment. However, the friend insisted they take the baby to the hospital. They drove to the parking lot at Santa Clara Valley Medical Center, where Renata and her husband, Wieslaw, were parked. Owczarska and Renata then took the baby to the emergency room. The baby suffered extensive and serious burns and respiratory injury. Owczarska suffered first and second degree burns, mostly on her hands and face.

Later, Renata returned to the parking lot, and she and Wieslaw took defendant to get some money, cigarettes, and a bottle of liquor, which he drank in the car. They then drove to a friend's apartment. Renata and Wieslaw entered, but defendant stayed in the car and fell asleep. Police found him there and arrested him. According to Renata, defendant was depressed because he had closed his business and was not working.

---

[3]Defendant admitted disconnecting the phone and telling Owczarska she would not live past her birthday but denied hitting her or threatening to kill her. He felt her life was threatened by her drug abuse and the company she kept.

[4]According to defendant, he had sarcastically said, " '[I]t's not like I was trying to kill myself, you know, something like that."

Jeffrey Weber, an investigator for the San Jose Fire Department, testified as an expert in determining the origin and cause of fires. He went to the scene of the explosion and found six heavily damaged apartments and others with moderate damage.[5] He traced the origin of the explosion to defendant's apartment, No. 4. He explained that gas lines had been cut or forcibly broken, and the other parts of the heater had been dismantled, allowing gas to flow freely into the apartment. He noted that attached to the heater were printed instructions in case the pilot light went out. They do not require that the gas lines be cut or the heater dismantled.

Weber explained that an accumulation of gas could be ignited by a refrigerator or a light switch cycling on but opined that here it was probably ignited by the cigarette lighter found near the heater. According to Weber, the safest place in the apartment was the bathroom.

Owczarska, Renata, and Wieslaw testified that there had always been problems with the wall heater and the pilot light. Renata said she had on occasion smelled gas in the apartment. Wieslaw testified that after the explosion, defendant told him about the smelling gas but did not mention trying to fix the heater.

*The Defense*

Defendant testified that he had his own business for three years but sold it in January 1999 because he was losing money. He had money in the bank and decided to take several weeks off. He said he was not happy about his employment situation but denied being depressed about it. He also denied that he jammed the door lock and filled the apartment with gas to harm Owczarska or the baby or destroy the apartment.

Defendant testified that on February 5, 1999, he had four or five brandies, starting about 6:00 p.m.[6] Around 8:00 p.m., the heater would not start, but Owczarska was able to light it. At 11:00 p.m., he fell asleep, and at 2:00 a.m., Owczarska woke him up. She asked for money and left. Defendant noticed that the heater was off again, and when he tried to light it, it blew up. He smelled gas, heard a "hissing sound," and decided to fix it. As he tried to tighten a gas line fitting, his wrench slipped and cracked the pipe. Fearing

---

[5]Ed Zapata and his family, Sean Trenery and his family, and Kim Soon and her husband lived in other apartments in the building. They testified that the explosion destroyed or substantially damaged their apartments. The Zapatas and Trenerys were also injured by the blast.

[6]Defendant admitted using powered cocaine on February 4 but denied smoking crack with Owczarska on February 5. A blood test taken on February 6 revealed a .12 blood-alcohol level and the presence of cocaine and cocaine metabolites.

another explosion, he ripped out gas lines, wires, and a valve and stuffed a plastic bag in the pipe to plug the gas leak. Defendant decided to wait for Owczarska rather than disturb the landlord. He opened the doors and windows to air out the apartment, but when he got cold, he closed everything. He then returned to the couch and fell asleep.

Defendant woke up when he heard Owczarska yelling and pounding on the door. She seemed paranoid, and defendant thought she was on drugs. Both smelled gas, and defendant picked up the baby, gave her to Owczarska, and told her to leave. However, Owczarska put the baby down and pulled out a cigarette lighter. Defendant "freaked" and told her the place could blow up. He then went into the bathroom and was there when the apartment exploded.

Defendant and Owczarska fled with the baby to a friend's house and then to the hospital parking lot to see Renata and Wieslaw. Renata and Owczarska took the baby to the emergency room, and defendant and Wieslaw waited outside. Later, Renata and Wieslaw took defendant to the bank and then to the store, where he bought cigarettes and a pint of schnapps. From there, they drove to a friend's apartment so Renata and Wieslaw could freshen up. Defendant stayed in the car, drank the pint of schnapps, and fell asleep.

After his arrest, defendant wrote to Owczarska. In one letter he told her to tell the truth, saying, "Look where you got me with those lies . . . ." He also told her not to "look good at [his] expense." At trial, he explained that "I just told her, you know, not to lie because she wants to look good, you know, for the family court to get her baby back. She makes all those lies up."

In another letter he wrote in Polish, he asked her to forgive him for "[a]ll the bad things I have caused you." He disagreed that the Polish words he used meant "evil things" rather than simply "bad things." In another letter, he warned her not to volunteer information and not to incriminate herself or the people she cares for. He testified that his advice was directed toward Owczarska's dealings with social workers, who were trying to take the baby away from her. In another letter, he told Owczarska to destroy the letters and documents he sent her because he was afraid the district attorney would subpoena "all incriminating paper." Defendant testified that there was nothing incriminating in his letters and that his advise to destroy them was "[j]ust a figure of speech."

### III. *Denial of Continuances**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 672.

## IV. *Aggravated Arson*

■ Defendant contends there is insufficient evidence to support a conviction for aggravated arson under section 451.5, subdivision (a)(3).

This section requires proof that the defendant was responsible for a fire that "caused damage to, or the destruction of, five or more inhabited *structures.*"[13] (§ 451.5, subd. (a)(3), italics added.) Section 450, subdivision (a) defines "structure" as "any *building*, or commercial or public tent, bridge, tunnel, or powerplant." (§ 450, subd. (a), italics added.)

Weber's testimony is substantial evidence that the explosion and fire damaged at least six apartments. The record also contains photographs of defendant's apartment complex. As these photographs reveal, defendant's apartment was one of several virtually identical units in a two-story structure. The upper units share a common roof, an exterior covered walkway, and stairways to the ground floor. The upper unit floors are connected to the ceilings of the lower units. All units are connected to neighboring units by common walls. Each unit has an exterior front door and windows that face a central courtyard with a swimming pool.

Defendant claims that an apartment in his complex is not a *building* and therefore does not come within the definition of "structure" in section 450, subdivision (a). Thus, the damage to five or more apartments does not establish "damage to, or the destruction of, five or more inhabited structures" as required by section 451.5, subdivision (a)(3).

The People argue that to effectuate the purpose of the statute and avoid absurd results, *building* must be construed broadly and expansively to include individual units in an apartment complex.

■ In construing statutes, our fundamental goal is to "ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*People v. Jenkins* (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d 903, 893 P.2d 1224].) To find intent, we first turn to the words of the statute. Viewing them in context and in light of the nature and purpose of the statute, we give the

---

[13]Section 451.5 provides, in relevant part, "(a) Any person who willfully, maliciously, deliberately, with premeditation, and with intent to cause injury to one or more persons or to cause damage to property under circumstances likely to produce injury to one or more persons . . . sets fire to, burns, or causes to be burned . . . any residence . . . is guilty of aggravated arson if one or more of the following aggravating factors exists: [¶] . . . [¶] (3) The fire caused damage to, or the destruction of, five or more inhabited *structures.*" (Italics added.)

words their plain, everyday, commonsense meaning. However, because legislative intent ultimately prevails over statutory language, we do not adopt the literal meaning of words if it would lead to absurd results. Rather, we will, if possible, read the words so as to conform to the spirit of the statute. (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129]; *People v. Pieters* (1991) 52 Cal.3d 894, 898-899 [276 Cal.Rptr. 918, 802 P.2d 420].)

██ "The Penal Code does not define 'building' for purposes of arson; we therefore apply the plain meaning of the word." (*People v. Labaer* (2001) 88 Cal.App.4th 289, 292 [105 Cal.Rptr.2d 629].) In *People v. Moreland* (1978) 81 Cal.App.3d 11, 18, footnote 4 [146 Cal.Rptr. 118], the court addressed the meaning *building* as used in section 246, which proscribes discharging a firearm into, among other things, an "occupied building." Quoting a variety of dictionaries, the court noted that "[t]he word 'building' commonly has been defined as: [¶] . . . [¶] '[A] constructed edifice designed to stand more or less permanently, covering a space of land, usu. covered by a roof and more or less completely enclosed by walls, and serving as a dwelling, storehouse, factory, shelter for animals, or other useful structure—distinguished from structures not designed for occupancy (as fences or monuments) and from structures not intended for use in one place (as boats or trailers) even though subject to occupancy' . . . (Webster's New Internat. Dict. (3d ed. 1961) p. 292, col. 1); [¶] '[A] relatively permanent essentially boxlike construction having a roof and often windows and enclosing within its walls space, usually on more than one level, for any of a wide variety of activities, as living, entertaining, manufacturing, etc.' (Random House Dict. of the Eng. Language (unabridged ed. 1973) p. 194, col. 3); [¶] 'An edifice for any use; that which is built, as a dwelling house, barn, etc.' (Funk & Wagnalls Standard Comprehensive Internat. Dict. (Bicentennial ed. 1973) p. 175, col. 1); [¶] 'Something that is built; a structure; an edifice' (American Heritage Dict. of the Eng. Language (1960) p. 174, col. 1); [¶] 'That which is built; a structure, edifice: now a structure of the nature of a house built where it is to stand' (1 Oxford Eng. Dict. (1933) p. 1162, col. 2)." (*People v. Moreland, supra*, 81 Cal.App.3d at p. 18, fn. 4, italics omitted.)

██ ██ In ordinary usage and consistent with the above definitions, *building* usually describes a covered structure that stands predominately by itself and appears more separate and distinct from any other structure than connected to and a part of another structure.

This understanding of *building* supports defendant's position. None of the individual apartments in defendant's complex projects an identity that is

more separate and distinct from the complex than connected to it. Indeed, photographs indicate that the apartments were not separately constructed and later joined together. Rather, the entire complex appears to have been built as a single entity, comprising multiple units. Each unit constitutes an integral part of the whole complex. None could be removed without compromising the integrity of the complex because the fundamental elements of each unit—walls, ceilings, floors—are structurally inseparable from the whole. Moreover, none of the units has an external shape or identity that is independent of the shape and identity of the entire complex.

As noted, the People argue that the Legislature intended *building* to have a broad and expansive meaning in order to effectuate the purpose of the aggravated arson statute. This view is not unreasonable.

The Legislature enacted section 450 (definitions) and section 451 (simple arson) in 1979, replacing former sections 447a through 450a. (Stats. 1979, ch. 145, §§ 1-8, pp. 338-339.) The former arson statutes listed several different types of structures. For instance, former section 447a applied to "the burning of any dwelling house, or any kitchen, shop, barn, stable or other outhouse that is parcel thereof, or belonging to or adjoining thereto . . . ." (Stats. 1929, ch. 25, § 1, p. 46.) Section 451, subdivision (b) basically replaced former section 447a, but used the phrase "inhabited structure" rather than the term "dwelling house." (*People v. Green* (1983) 146 Cal.App.3d 369, 378 [194 Cal.Rptr. 128].) It is reasonable to infer that the Legislature intended the broadest definition of the phrase "inhabited structure," and intended that a "dwelling house" would qualify as such. Moreover, in analogous contexts, courts have concluded that an apartment is a "dwelling house." (*People v. Jischke* (1996) 51 Cal.App.4th 552, 556 [59 Cal.Rptr.2d 269] [defendant convicted of discharging a firearm at an inhabited dwelling house, per § 246, where he shot through his own apartment floor and thereby shot at the apartment below]; *People v. Cruz* (1996) 13 Cal.4th 764, 778 [55 Cal.Rptr.2d 117, 919 P.2d 731] [apartment qualifies as a dwelling house for purposes of burglary statutes, §§ 459 and 460].)

We also note that section 459, the burglary statute, provides, in relevant part, "Every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse *or other building*, tent, vessel . . . with intent to commit grand or petit larceny or any felony is guilty of burglary." (§ 459, italics added.) The phrase "or other building" suggests that at least for the purposes of burglary, the Legislature considers houses, rooms, apartments, tenements, shops, warehouses, stores, mills, barns, stables, and outhouses to be buildings.

Furthermore, the Legislature has provided a range of punishment for arson, depending on the harm caused.[14] In 1994, the Legislature enacted section 451.5 (the aggravated arson statute) out of concern that the existing penalties for arson did not take into account "the extent of the damage inflicted." (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1309 (1993-1994 Reg. Sess.) as amended Aug. 10, 1994, p. 4.)[15] The enactment was designed to "increase the penalties for the worst arsonists who . . . inflict serious damage." (*Ibid.*) Given this purpose, the People argue that section 451.5, subdivision (a)(3) in general and the term *building* in particular must be construed to promote the Legislature's intent to punish more severely those whose conduct creates a greater risk of danger to life and property. For example, in causing a fire in a multi-unit complex, defendant's conduct posed a far greater risk of damage to property and injury to life than if he had caused a fire to a single, detached home. According to the People, "[i]t simply is more consistent with the legislative intent . . . to recognize that each occupied apartment unit in an apartment building itself is a 'structure' within the contemplation of the statute." Conversely, it would be incongruous with the expressed legislative intent to impose the same punishment in a case involving damage to a single-family house as in a case involving damage and/or injury to numerous conjoined apartments and their inhabitants.

The People further argue that giving *building* its ordinary meaning would lead to absurd results. They argue that in terms of the danger posed to human life, it is irrational to distinguish a fire that damages five apartments in a single building from a fire that damages five separate homes in a housing tract. Thus, *building* must be interpreted to include individual apartments so that section 451.5 covers both situations.

The People's analysis has persuasive force. However, it does not completely convince us that the Legislature intended *building* to include individual units in an apartment complex. Indeed, under the People's interpretation, building would also include individual rooms in a hotel. Nor do we find that giving *building* its ordinary meaning necessarily leads to absurd results.

We point out that the Legislature used the term *building* to define the much broader term *structure*: a building is a structure, but not all structures

[14]For example, arson causing great bodily injury is punishable by terms of five, seven, or nine years (§ 451, subd. (a)); arson of an inhabited structure or property is punishable by terms of three, five, or eight years (§ 451, subd. (b)); arson of a structure or forest land is punishable by terms of two, four, or six years (§ 451, subd. (c)); arson of property is punishable for terms of 16 months, two, or three years (§ 451, subd. (d)); aggravated arson is punishable by a term of 10 years (§ 451.5, subd. (b)).

[15]We have taken judicial notice of the legislative history of the statute. (Evid. Code, § 452, subd. (c).)

are buildings. Thus the purpose of defining *structure* was to narrow the scope of the section 451.5, subdivision (a)(3). This purpose, however, undermines the People's view that the Legislature intended for *building* to have a broader more expansive meaning than it normally conveys. In this regard, we further point out that unlike the burglary statute noted above, section 450, subdivision (a) does not expressly list apartments or rooms in defining "structure" or otherwise suggest that *building* includes apartments and rooms. Given the specificity of the burglary statute, we question whether the Legislature would have relied on the word *building* to include structures—apartments, hotel rooms—that are not ordinarily referred to as buildings. Indeed, we doubt that a reasonable person would, or could, know from section 450, subdivision (a) that *building* included apartment units and hotel rooms. For this reason, the People's interpretation, if adopted, could raise serious constitutional questions in this case concerning whether the statute provided defendant with adequate and reasonable notice concerning the proscribed conduct. (See *United States v. National Dairy Corp.* (1963) 372 U.S. 29, 32-33 [83 S.Ct. 594, 597-598, 9 L.Ed.2d 561]; *People v. Superior Court (Caswell)* (1988) 46 Cal.3d 381, 389 [250 Cal.Rptr. 515, 758 P.2d 1046].) As a rule, however, we must avoid constructions that raise such constitutional concerns unless there is no other reasonable alternative. (See *People v. Anderson* (1987) 43 Cal.3d 1104, 1139 [240 Cal.Rptr. 585, 742 P.2d 1306].)

Next, we point out that the People's analysis is based in part on the increased risk of *injury* posed by causing a fire in a multidwelling apartment complex. However, it is the damage to *property* that makes arson in violation of section 451.5, subdivision (a)(3) different from simple arson and other forms of aggravated arson. Moreover, the arson statutes, as noted, provide a range of punishment depending on, among other things, the consequences of the fire—did it damage real or personal property; did it damage a building, or commercial or public tent, bridge, tunnel, or power plant; did it damage an inhabited structure; did it damage more than five inhabited structures; did it cause great bodily injury? In our view, the Legislature could reasonably choose to punish a person whose fire damaged five separate homes more severely than a person whose fire damaged five units in an apartment building or rooms in a hotel. Although in each situation, the potential danger to inhabitants may be equivalent, the magnitude of the danger and harm to *property* is rationally distinguishable. Furthermore, if one causes a fire that damages more than one unit in an apartment building or room in a hotel, he or she is punishable even if apartments and hotel rooms are not considered *buildings.* (See § 451, subd. (b).) Thus, although it does seem incongruous to punish a person who, for example, destroys an entire multidwelling apartment building the same as a person who destroys a single house, we cannot say that such a result is absurd.

Finally, the People's reliance on *People v. Green, supra,* 146 Cal.App.3d 369, to support their interpretation of *building* is misplaced. In *Green,* the defendant set fire to one apartment that had previously been vacated by the tenant. The defendant was convicted of simple arson of an inhabited structure, but on appeal, he claimed the recently vacated apartment did not constitute an *inhabited* structure. The court disagreed, noting that the defendant "was convicted of 'arson of an inhabited structure' *because he started a fire in a large apartment building,* thus endangering the lives of all of the building's occupants." (*Id.* at p. 379, italics added.) *Green* does not suggest that an individual apartment, whether occupied or not, constitutes a *building.* If anything, it suggests that the entire apartment complex, and not individual units, constituted the *building* for the purposes of the arson statute.

Given our discussion of the opposing interpretations of *building,* we consider the term to be ambiguous and reasonably susceptible of either interpretation, neither of which would necessarily frustrate the purpose of a statute, render it nugatory, or lead to an absurd result. We urge the Legislature to resolve this ambiguity by clarifying the meaning of *building* and the scope of the aggravated arson statute. Here, however, we resolve the conflict under the settled rule that where the language of a penal statute is susceptible to alternative reasonable interpretations, we give the defendant the benefit of a doubt and interpret it as favorably to him or her as is reasonably possible. (*People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 192 [96 Cal.Rptr.2d 463, 999 P.2d 686]; *People v. Alvarado* (2001) 87 Cal.App.4th 178, 185-186 [104 Cal.Rptr.2d 624].) Under the circumstances, we adopt the common and ordinary meaning of *building.* Under this meaning, an apartment in defendant's complex is not a *building.* Thus, we conclude that there is insufficient evidence to support defendant's conviction for aggravated arson under section 451.5, subdivision (a)(3).[16]

Our conclusion does not mean, however, that no conviction for arson may stand. ■ Under section 1260, a reviewing court is not restricted to the remedies of affirming or reversing a judgment of conviction. " 'Where the prejudicial error goes only to the degree of the offense for which the defendant was convicted, the appellate court may reduce the conviction to a lesser degree and affirm the judgment as modified, thereby obviating the necessity for a retrial. [Citations.]' " (*People v. Edwards* (1985) 39 Cal.3d 107, 118 [216 Cal.Rptr. 397, 702 P.2d 555]; *People v. Kelly* (1992) 1 Cal.4th 495, 528 [3 Cal.Rptr.2d 677, 822 P.2d 385]; *People v. Moretto* (1994) 21 Cal.App.4th 1269, 1278 [26 Cal.Rptr.2d 719]; *People v. Woods* (1992) 8 Cal.App.4th 1570, 1596 [11 Cal.Rptr.2d 231].)

---

[16]Given our conclusion, we need not address defendant's alternative claim that there is insufficient evidence that the apartments damaged by the explosion were "*inhabited* structures." (§ 451.5, subd. (a)(3), italics added.)

We note that simple arson under section 451, which involves the willful and malicious burning of any structure, is a lesser included offense of aggravated arson, and the trial court so instructed the jury.[17] In convicting defendant of aggravated arson, the jury necessarily found that defendant willfully, maliciously, deliberately, with premeditation, and with intent to cause injury to one or more persons or to cause damage to property under circumstances likely to produce injury to one or more persons, caused the explosion and fire in his apartment. (§ 451.5, subd. (a).) The undisputed evidence conclusively established that defendant caused great bodily injury and damaged an inhabited structure.

Here, principles of double jeopardy preclude a retrial for aggravated arson. (*People v. Shirley* (1982) 31 Cal.3d 18, 71 [181 Cal.Rptr. 243, 723 P.2d 1354] [no retrial where reversal due to insufficiency of evidence].) However, the evidentiary insufficiency went only to the degree of the offense. Under the circumstances, we consider it proper and appropriate to reduce defendant's conviction to arson causing great bodily injury, a lesser included offense. (§ 451, subd. (a).)

V.-VII.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

VIII.   *Disposition*

The judgment is reversed. Defendant's conviction for aggravated arson under section 451.5, subdivision (a)(3) is reduced to simple arson causing great bodily injury in violation of section 451, subdivision (a). The matter is remanded to the trial court for resentencing.

Bamattre-Manoukian, Acting P. J., and Rushing, J., concurred.

Appellant's petition for review by the Supreme Cout was denied October 16, 2002.

---

[17]The court also instructed on attempted aggravated arson. (§§ 664, 451.5.)

*See footnote, *ante*, page 672.