[No. A072616. First Dist., Div. One. Dec. 10, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDREW JISCHKE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts B through D of the Discussion.

**COUNSEL**

Cynthia Thomas and Mark Shenfield, under appointments by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Michael E. Banister and Susan E. Myster, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**DOSSEE, J.**—Defendant fired a shot into the floor of his apartment and, hence, into the apartment below, striking an occupant of that lower dwelling. He was convicted in a jury trial of assault with a firearm and discharging a firearm at an inhabited building. The jury also found that defendant had personally used a firearm in the commission of the assault, but the jury found that defendant did not intentionally inflict great bodily injury upon the victim.[1] (Before the trial began, defendant also pled guilty to being a felon in possession of a gun.) On appeal, defendant raises several challenges to the instructions given to the jury. We affirm the judgment.

FACTS

Defendant, his girlfriend, and their two children lived at 241 Randolph Street in Napa. In the apartment below, at 243 Randolph Street, lived Betty Fry and her teenaged son, Joe Ortiz. Relations between the neighbors were cordial; defendant had visited Betty Fry's apartment.

On the evening of February 11, 1994, 14-year-old Timothy Kennedy was visiting his friend, Joe Ortiz, and planned to spend the night. About 11:30

---

[1]Defendant was placed on probation for five years upon condition that he serve one year in the county jail.

p.m., as the two boys were planning to go to bed, they heard the sounds of someone vacuuming in defendant's apartment above.

Tim Kennedy was holding his aluminum baseball bat, and he used it to tap two or three times in rapid succession on the ceiling. He knew from previous visits to the apartment that this signal was used to alert the upstairs apartment dwellers they were making too much noise.

A few seconds after Tim Kennedy tapped his bat, the vacuuming stopped. But then the vacuuming soon resumed. Tim started to tap the ceiling again, but Betty Fry told him to let the people upstairs finish their vacuuming. (Joe Ortiz, however, thought Tim did tap the ceiling again.) Within moments the vacuuming stopped a second time and then there was a popping sound. Tim then discovered he had been shot.

Betty Fry called 911, and Napa police officers responded. After getting the preliminary story from Betty Fry and the two boys, Officer Troendly headed to the upstairs apartment, but then he saw defendant leaving the building on a bicycle. He detained him for questioning. Defendant initially denied owning or firing any weapon that night. He also denied hearing a shot. A few minutes later, however, as other officers were on their way upstairs, defendant admitted owning a gun. He then told Officer Troendly that he had been cleaning his gun in the bedroom and it went off when he was "dry firing" it, that is, pulling the trigger of what he thought was an empty gun.

When Officer Davis approached him, however, defendant gave a different story. He told Officer Davis that he had been vacuuming his bedroom and saw the gun under the bed. He picked it up, not sure whether it was loaded or not, pointed it at the floor, and pulled the trigger to check. The gun went off, but defendant did not think the bullet had penetrated the floor.

Defendant was then taken upstairs into his apartment where he showed the officers the bullet hole. He also showed them the location of the gun. The police took from defendant's dresser a .22-caliber Ruger pistol which had an empty .22-caliber casing in it. Defendant was arrested at the scene, and the police found in his pants pocket a live .22-caliber bullet.

Later, at the jail, defendant was questioned again, and this time he told Officer Davis that when he picked up the gun while vacuuming, the gun went off on its own, as the hammer was fully cocked. He denied pulling the trigger.

At trial, a firearms expert testified that he tested defendant's gun and found that the gun was not defective. The gun fires only when the hammer is

fully cocked and the trigger pulled. It will not fire when the hammer is quarter-cocked (a safety position to keep the hammer off the firing pin) or half-cocked (the position for loading or unloading). Even when the officer hit the gun with a rubber mallet, the gun did not discharge on its own without the trigger being pulled. Only when the hammer spur was hit directly did the gun go off. But if the gun were dropped on the floor, hitting the hammer spur, the muzzle would be up, and the gun would fire upwards. Moreover, the witness testified that dry firing is neither a necessary nor a safe way to see if the gun is loaded.

The victim, Tim Kennedy, was treated and released that night with the bullet still lodged in his shoulder. A few months later he had surgery to remove some (but not all) of the bullet fragments.

*Defense*

Tammy Sherman, defendant's girlfriend, testified that about three days before the incident she directed defendant to unload the gun after she found him crying and upset, with the gun nearby. She saw him take the bullets out of each chamber. She tossed the gun under the dresser.

On the night of the shooting, she cut her finger on a piece of broken glass in the bedroom which had apparently come from a bottle that had been broken a few days earlier. As she sat on the bed tending to her finger, defendant vacuumed the bedroom. Soon something got stuck in the vacuum cleaner; there was a smell of burning rubber. Defendant shut off the vacuum to remove the obstruction, a nail; then he resumed vacuuming.

As Ms. Sherman was trying to get the sliver of glass out of her finger she heard a pop. She looked up and saw defendant holding a gun with a look of surprise on his face. She did not hear any tapping by the downstairs neighbors.

## DISCUSSION

### A. *Firing at a Building*

Defendant was convicted of violating Penal Code section 246, which prohibits the willful and malicious discharge of a firearm "at an inhabited dwelling house." Defendant complains that the jury should have been instructed that "at" a building does not mean "inside" a building.

Although defendant has framed his argument as an objection to the instructions, we construe his argument as one directed to the sufficiency of the evidence to sustain the verdict. There was no factual dispute as to where the shot was fired. Defendant's true argument seems to be that because he fired the gun inside his own apartment, he should not have been convicted of violating Penal Code section 246.

Defendant relies upon *People* v. *Stepney* (1981) 120 Cal.App.3d 1016 [175 Cal.Rptr. 102], in which the court distinguished between firing "at" a dwelling and firing "within" a dwelling. In that case, the defendant forced his way into the victim's home, demanded money, and fired his gun at the television set to prove he was " 'not playing any games.' " (*Id.* at p. 1018.) The court held that the defendant could not be convicted under Penal Code section 246, as he did not fire the gun *at* the house.

However, the *Stepney* court anticipated the case before us: "[A] different question would be presented if a person fired a weapon from one apartment into an adjoining apartment, either through the common wall, or through the floor or ceiling." (120 Cal.App.3d at p. 1021.)

Here, although defendant fired the gun while standing inside his own apartment, he also fired it in the direction of the apartment below. Defendant's floor was Betty Fry's ceiling. In shooting through his own floor, defendant necessarily shot into and "at" the adjacent dwelling unit. We conclude that defendant was properly convicted of violating Penal Code section 246.

We also reject defendant's assertion that the jury should have been required to find defendant shot *into* the lower apartment. In making that assertion, defendant seems to be arguing that the jury was required to find that defendant intended to hit that lower dwelling and not just his own floor. But Penal Code section 246 is a general intent crime. (*People* v. *Froom* (1980) 108 Cal.App.3d 820, 826 [166 Cal.Rptr. 786]; *People* v. *Williams* (1980) 102 Cal.App.3d 1018, 1029 [162 Cal.Rptr. 748].) There is no requirement that the defendant intend to strike the building. (*People* v. *Cruz* (1995) 38 Cal.App.4th 427, 431-433 [45 Cal.Rptr.2d 148].) As for all general intent crimes, the question is whether the defendant intended to do the proscribed act. (See generally, *People* v. *Hood* (1969) 1 Cal.3d 444, 456-457 [82 Cal.Rptr. 618, 462 P.2d 370]; accord, *People* v. *Davis* (1995) 10 Cal.4th 463, 518-519, fn. 15 [41 Cal.Rptr.2d 826, 896 P.2d 119].)

B.-D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Strankman, P. J., and Stein, J., concurred.

---

*See footnote, *ante*, page 552.