[No. C035402. Third Dist. July 30, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTOINE NATHANIEL WATIE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.

**COUNSEL**

Cynthia A. Thomas, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Carlos A. Martinez and Alison Elle Aleman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HULL, J.**—A jury convicted defendant Antoine Nathaniel Watie of voluntary manslaughter and found true the allegation he personally used and discharged a firearm during the course of that crime, causing the victim great bodily injury. (Pen. Code, §§ 192, subd. (a), 12022.5, subd. (a)(1), 12022.53, subd. (d); further undesignated statutory references are to the Penal Code.) The jury also convicted defendant of discharging a firearm at an inhabited dwelling and personally causing great bodily injury to the victim, James Edward Lee. (§§ 246, subd. (a)(1), 12022.53, subd. (d).)

Defendant contends: (1) the court impermissibly instructed the jurors on defense of property pursuant to CALJIC Nos. 5.40 and 5.42; (2) the court "failed to properly instruct that self-defense applied to" the charge of discharging a firearm at an inhabited dwelling; (3) the court failed to give a mistake of fact instruction; (4) the firearm "enhancement must be reversed because the Legislature did not intend for this particular enhancement" to apply here; (5) "the trial court failed to instruct the jury that the affirmative defense of self-defense applied to the enhancement"; and (6) imposition of the 25-year-to-life state prison sentence "constitutes cruel and unusual punishment." We affirm the judgment.

## FACTS

Anita Devonn Thompson-Lee (Thompson) lived with her husband, James Lee, and their five-year-old son and four-year-old daughter. Thompson had known Lee for 20 years and had been married to him since 1994. Defendant is Thompson's, but not Lee's, son.

Lee had seven prior convictions for armed robberies and kept two rifles in the home.

While Lee was in prison, defendant lived at home with Thompson. Lee returned when defendant was 13 years old, and defendant moved out of the home in favor of Thompson's mother's home. Defendant testified Lee mistreated him and defendant's younger brother, Derron Brown, while they lived with Lee and that, once during a dispute, Lee pulled out a sawed-off shotgun and pointed it at defendant. Defendant testified he was afraid of Lee and that he often saw bruises and scratches on his mother after she visited defendant.

Thompson did not want her other son, Derron Brown, to live with her, because Lee physically and mentally abused Brown, too. Brown testified Lee beat him with a leather belt in 1998 and punched him in the nose in 1999. Because Lee beat and threatened Brown, Brown left his mother and Lee's home and moved in with his grandmother.

On the night of Lee's death, Thompson told the investigating detective that she did not believe Lee was abusive.

Defendant's aunt, Felicia Rule, testified Lee had become progressively more negative toward Thompson in the year prior to Lee's death and that he treated Thompson in a derogatory, demeaning and degrading manner. Two witnesses testified to incidents in which Lee had beaten Thompson. Thompson and Lee's problems worsened after Lee's own son died in a car accident in July 1998.

On the afternoon of May 5, 1999, Thompson and Lee got into an argument in their living room. During the argument, Lee knocked a plate out of Thompson's hand and it hit their five-year-old son. Lee punched and slapped Thompson in the face and tried to hold her down on the couch. When Thompson tried to hit Lee with a wooden statue, Lee took it away and began hitting Thompson on the head with it.

After the fight, Thompson called her sister, Lolita Thompson (we shall use Lolita Thompson's first name for the sake of clarity), and asked Lolita to come to get her. Lee was screaming and cursing at Thompson as Thompson left for her mother's house.

Lee's neighbor, David Medlin, saw Lee as he tried to prevent Thompson from leaving. Medlin spoke with Lee for about 15 or 20 minutes; Lee had calmed down by the end of the conversation.

At her mother's home, Thompson saw the defendant and two of his friends—David Towner and Jermain Williams. Thompson's face was bloody and she told defendant what had happened and told him Lee would not let her take her children. Defendant told Thompson to call the police and asked Thompson if she wanted her children. Thompson said she did.

Defendant and his friends left to go shopping. At one point, Williams told defendant and Towner that they should go beat up Lee and give him a taste of his own medicine. Defendant testified that no one discussed this comment, or took it seriously. Thereafter, defendant dropped off Williams at his house, and defendant and Towner went to defendant's girlfriend's house to watch television.

About an hour after her fight with Lee, Thompson called the police. During the 911 telephone call, Thompson told the 911 operator Lee had no weapons in the house.

Sacramento City Police Officer Charles Gomez responded to the 911 call at 8:11 p.m. Thompson told Gomez she had been the victim of domestic violence, but Gomez testified he did not see any injuries on Thompson, nor did she tell him of any. Thompson told Gomez defendant might get upset, although Gomez did not follow up on her warning.

Thompson asked Gomez to retrieve her children from Lee, but Gomez told her he could not, because Thompson and Lee were married and the children were his, too. Gomez told Thompson she needed to resolve any custody issues in court.

Thompson did not go to the hospital and did not file charges against her husband. Thompson testified she was afraid of Lee's anger if she had him arrested, and she did not want to send him back to prison.

Thompson called Lee that night. At trial she testified Lee was not calm and was acting "kind of paranoid." On the night of the murder, however, Thompson told the investigating detective Lee was "kind of normal."

After Gomez left, Thompson and defendant spoke by telephone. Thompson told defendant the police would not pick up her children, and defendant again asked Thompson if she wanted them. Thompson testified she told defendant not to get the children although defendant testified he told Thompson that he would come and pick her up and take her to Lee's house to get them. Before he left his apartment, defendant put a gun in his back pocket.

Defendant and Towner picked up Williams, went to a store for cigarettes, and returned to Thompson's mother's house. According to defendant, Thompson decided not to go with defendant, but defendant told her that he would go get her children anyway.

Defendant, Towner and Williams went to Lee's home, parked in front of the house, and went to the front door. Williams tried to open the security door but found it was locked. The interior door, however, was open and they could see inside.

Lee jumped up from the couch and came to the door. Williams and Lee started arguing and Williams challenged Lee to come outside. Lee told the men they should leave if they did not want any problems. Defendant told Lee he was there to pick up his stepbrother and stepsister; Lee said he would not let defendant take the children.

Their conversation was heated and, at one point, Lee went back into the room and reached under the couch. Williams thought Lee was going to get a pistol and he and Towner backed away from the door. Defendant saw that Lee had merely grabbed his shoes from behind the couch and defendant stayed where he was.

Defendant continued to argue with Lee. Williams testified Lee told defendant that Lee was going to "whip his ass," and defendant told Lee to come outside, but defendant denied challenging Lee to fight. Defendant did threaten to have Lee sent back to prison.

Williams and defendant then watched Lee go to the back of the house and defendant thought Lee was going to get the children. Williams could see

only Lee's shadow when Lee returned; he thought Lee had a rifle, or a shotgun, in his hands. Williams shouted, "he's got a gun, he's got a gun" and retreated to the car.

Defendant testified he saw a rifle, or a shotgun, in Lee's hands and saw him raise it toward him. He thought Lee was going to kill him. Defendant reached into his back pocket, pulled out his gun, closed his eyes, and fired at Lee. Defendant ran from the door halfway to the car, walked the rest of the way, and then drove off.

In the car after the shooting, Williams thought defendant told him Lee had a gun. Defendant also said something to the effect of "Damn, I shot the fool." Defendant claimed he did not turn himself in to the police because he was scared.

Thompson's mother received a telephone call from Thompson's five-year-old son, who asked her to come pick him up. Thompson went home and found the police there and her children at a neighbor's house. The five-year-old boy told his mother that defendant and Lee were arguing, he heard a "boom boom," and then saw Lee lying on the floor.

After his daughter told him she heard gunshots, Medlin, the neighbor, went to Lee's house to investigate. He saw the two young children in the dining room. They told him their dad was on the floor and there was blood everywhere. The little boy unlocked the door and let Medlin in; Medlin saw Lee facedown on the floor. Medlin was positive he observed the butt of a Winchester rifle under Lee's body. He made sure that no one touched anything in the room until the police arrived.

Another neighbor, Annie Bravo, heard the gunshots. She, too, went to Lee's house to investigate and saw the metal of a gun barrel sticking out from underneath Lee's body. A third neighbor, John Yardell, also testified he saw something that looked like the barrel of a gun under Lee's body.

Sacramento Police Officer Gary Wohlgemuth heard the gunshots and arrived on scene in less than 10 minutes (approximately 9:31 p.m.). Wohlgemuth saw Lee's body on the floor. He did not see any guns but did see a small statue protruding from beneath Lee's body.

When paramedic Jesse Beltran arrived at 9:34 p.m., Lee was dead. Beltran remembered a wooden object underneath Lee but did not observe any guns around his body.

Sacramento Police Detective William Harrison arrived at the scene of the shooting at 10:23 p.m. He saw two bullet holes in Lee's chest and four bullet

holes in the security door. The officer identified a small wooden African-style statue that was located near Lee's body, but the police did not collect that item as evidence. The two rifles that Lee owned were not found in the home.

## HISTORY OF THE PROCEEDINGS

By an amended information filed on February 10, 2000, the People charged defendant with second degree murder (§ 187, subd. (a)) and discharging a firearm at an inhabited dwelling. (§ 246.) As to the murder charge, the People further alleged defendant personally used a firearm. (§ 12022.5, subd. (a)(1).) As to both charges, the People alleged defendant intentionally and personally discharged a firearm causing great bodily injury. (§ 12022.53, subd. (d).) The People further alleged that defendant committed the section 246 offense while released on bail. (§ 12022.1.) Prior to trial, defendant admitted the bail-enhancement allegations.

After the matter was submitted to the jury, the jury asked the court to clarify the term "malice." The court said that "malice" as to the murder charge was defined in CALJIC No. 8.11 and "malice" as to the section 246 charge was defined in CALJIC No. 1.22. The court identified the pages at which each of those instructions appeared in the jury's instruction packet.

The jury found the defendant not guilty of first and second degree murder but convicted him of the lesser included offense of voluntary manslaughter (§ 192). The jury also convicted defendant of discharging a firearm at an inhabited dwelling (§ 246); found the firearm enhancements (§ 12022.53, subd. (d)) true as to both charges; and the use enhancement (§ 12022.5, subd. (a)(1)) true as to the manslaughter charge.

On the conviction for discharging a firearm at a dwelling, the trial court sentenced defendant to five years in prison, plus a life term with a minimum sentence of 25 years. (§ 12022.53, subd. (d).) The court added a consecutive two-year state prison term for the bail enhancement under section 12022.1. Defendant appeals.

## DISCUSSION

## I

### Jury Instructions

Defendant contends the court erred in giving CALJIC Nos. 5.40 and 5.42 (defendant refers to CALJIC No. 5.43 in his brief, but CALJIC No. 5.42 was

the instruction given by the trial court of which he complains). Defendant argues the court erred in failing to inform the jury "the self-defense instructions applied to the Section 246 charge," and by "not appropriately explaining the malice element" that is required to convict defendant of a violation of section 246.

Defendant argues that the court should have given a mistake-of-fact instruction to the jury. We reject these contentions.

A. *CALJIC Nos. 5.40 and 5.42.*

■ Defendant argues the jury should not have been instructed concerning the defense of a dwelling. He argues Lee's "justification for a homicide was irrelevant to the issues that were before [defendant's] jury." Defendant says these instructions allowed the jurors to presume Lee "was acting in lawful defense of his property" and "effectively removed the defense of actual self-defense from the jury's consideration." Further, he argues that there was "no evidence that [defendant] nor anyone else attempted to forcibly enter the residence." We disagree.

■ " 'The trial court functions both as a neutral arbiter between two contesting parties and as the jury's guide to the law. This role requires that the court fully instruct the jury on the law applicable to each particular case. " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' " ' " (*People v. Daya* (1994) 29 Cal.App.4th 697, 712 [34 Cal.Rptr.2d 884].)

■ Here, in addition to the instructions that generally describe self-defense, the court instructed the jury on the defense of a dwelling, using CALJIC Nos. 5.40 and 5.42: "The lawful occupation—the lawful occupant of a residence has the right to request a trespasser to leave the premises. If the trespasser does not do so within a reasonable time, the occupant may use reasonable force to eject the trespasser. [¶] The amount of force which may be used to eject the trespasser is limited by what would appear to a reasonable person under the existing circumstances to be necessary to prevent physical injury or death to the occupant. [¶] A person may defend his home or dwelling against anyone who manifestly intends or endeavors in a violent or riotous manner, to enter that home or dwelling or who appears to—or who appears to intend violence to any person in that home or

dwelling. The amount of force which the person may use in resisting the trespass is limited by what would appear to a reasonable person in the same or similar circumstances necessary to resist the violent or unlawful entry. [¶] He is not bound to retreat even though a retreat might safely be made, he may resist force with force, increasing it in proportion to the intruder's persistence and violence if the circumstances which are apparent to the lawful occupant of the property are such as would excite similar fears and a similar belief in a reasonable person." (CALJIC Nos. 5.40, 5.42.)

Given the facts of this case, these instructions were proper. ■ To be acquitted of responsibility for a person's death based on self-defense, the defendant must have acted pursuant to an actual and reasonable belief in the need to defend himself under circumstances that would lead a reasonable person to fear the imminent infliction of death, or great bodily injury. (§§ 197, 198, 199; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-1083 [56 Cal.Rptr.2d 142, 921 P.2d 1].) "The justification of self-defense requires a double showing: that defendant was actually in fear of his life or serious bodily injury and that the conduct of the other party was such as to produce that state of mind in a reasonable person." (*People v. Sonier* (1952) 113 Cal.App.2d 277, 278 [248 P.2d 155].)

"Generally, if one makes a felonious assault upon another, or has created appearances justifying the other to launch a deadly counterattack in self-defense, the original assailant cannot slay his adversary in self-defense unless he has first, in good faith, declined further combat, and has fairly notified him that he has abandoned the affray." (*People v. Gleghorn* (1987) 193 Cal.App.3d 196, 201 [238 Cal.Rptr. 82].) In *Gleghorn*, the defendant entered the room of the victim, started beating the victim's bed with a stick and set fire to some clothes. (*Id.* at pp. 199-200.) At that point, the victim shot an arrow at the defendant. (*Id.* at p. 200.) After he was convicted of assault, defendant argued on appeal he was legally justified in defending himself from the victim's deadly counterattack, because he initially committed only a simple assault. (*Id.* at p. 201.) The appellate court rejected this claim and concluded that, because the victim was justified in reasonably fearing for his life by the defendant's initial lethal actions and acted lawfully to defend himself, the defendant did not have the right of self-defense. (*Id.* at p. 202.)

The *Gleghorn* court also rejected defendant's claim the trial court erred in giving CALJIC No. 5.42. (*People v. Gleghorn, supra,* 193 Cal.App.3d at pp. 202-203.) The defendant argued that CALJIC No. 5.42 is inconsistent with section 198.5. (*People v. Gleghorn, supra,* at pp. 203-204.) Section 198.5 provides in pertinent part: "Any person using force intended or likely to

cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred." The court concluded that, just because the presumption in section 198.5 did not apply to the victim, "that does not mean that [the victim] did not have the right to defend himself against a violent attack in his own house . . . ." (*People v. Gleghorn, supra,* at pp. 203-204.) The court held that the trial court properly instructed the jury on the victim's right to defend himself. (*Ibid.*)

In *People v. Hardin* (2000) 85 Cal.App.4th 625 [102 Cal.Rptr.2d 262], the defendant ingested cocaine and became involved in an altercation with his cousin. The defendant ran into the house of a 79-year-old woman (*id.* at p. 627) and she threatened him with a hammer (*id.* at pp. 631-632). When the police arrived, he hit the woman with the hammer causing her death. (*Id.* at pp. 627-628.) On appeal he contended the language of CALJIC No. 5.17 was prejudicial to his claim of imperfect self-defense. (*Hardin,* at p. 632.) He reasoned that in entering the woman's house, he committed only a trespass. She responded with deadly force. Therefore, he reasoned, he did not forfeit his right to self-defense. (*Ibid.*) ▆▆▆ The court rejected this reasoning, because the woman was entitled to use force to evict defendant. (*Id.* at pp. 633-634.) Thus, the defendant had a duty to retreat; the woman did not. Her use of force was privileged; his was not. Therefore, he was not defending himself against a criminal attempt to take his life. (*Ibid.*)

These cases also establish that the right of a victim to defend himself and his property is a relevant consideration in determining whether a defendant may prevail when he seeks to negate malice aforethought by asserting the affirmative defense of imperfect self-defense.

Here, the jury was confronted with the question of whether defendant's use of deadly force was justified as he confronted Lee on the front porch of Lee's home and whether defendant's unlawful conduct created the circumstances that legally justified Lee's use of force. If Lee had a right to use force to defend himself in his home, then defendant had no right of self-defense, imperfect or otherwise. The court's instructions on Lee's rights and defendant's right to turn to deadly force correctly stated the law.

We note too that the jury apparently credited defendant's claim of imperfect self-defense when it found defendant guilty of the lesser offense of

voluntary manslaughter. To do so, it must have found that defendant had, or regained, the right to defend himself notwithstanding Lee's right to defend his home. The instructions defendant complains of here ultimately did not bear on the jury's verdicts.

We cannot accept defendant's claim that there was no evidence defendant, or his cohorts, attempted forcible entry into the residence. Both defendant and Williams testified Williams tried to open the security door to get into the house. Williams threatened and challenged Lee repeatedly through the security door, as the three men stood on Lee's porch. Moreover, defendant was guilty of trespass and was threatening Lee whether defendant was attempting to break into the house or not. There was no error in the challenged instructions.

B. *Instructions relating to section 246.*

Defendant argues the court committed instructional error regarding the charge that defendant discharged a firearm into an inhabited building in violation of section 246. We disagree.

Defendant first argues the court failed to properly define "malice" as the term is used in section 246. Defendant contends the court should have instructed the jury that the People had to prove the defendant "shot into the house without justification or excuse or with conscious indifference to or reckless disregard for the consequences."

Section 246 is a general intent crime. (*People v. Jischke* (1996) 51 Cal.App.4th 552, 556 [59 Cal.Rptr.2d 269].) As such, the term "maliciously" in section 246 is defined by section 7, item 4, as "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." The court correctly instructed the jury on this point.

Defendant cites *People v. Salcido* (1968) 263 Cal.App.2d 1, 6 [69 Cal.Rptr. 193], for the proposition that the type of malice to which section 246 refers requires a demonstration that the act was without lawful "justification, excuse or mitigating circumstance." *Salcido* is inapplicable to a charge of discharging a firearm at an inhabited dwelling. *Salcido* is a murder case, and as explained by *People v. Sekona* (1994) 27 Cal.App.4th 443, 450-457 [32 Cal.Rptr.2d 606]), the malice required for a conviction of a general intent crime (there, mayhem) was different from the "malice aforethought" required for murder.

Defendant also cites a string of cases for the proposition the trial court was required to instruct the jury that defendant acted "with a conscious

indifference to or reckless disregard for the consequences" of his actions. These cases do not support defendant's cause, because not one defines "maliciously" in the context of section 246.

■ In *People v. Chavira* (1970) 3 Cal.App.3d 988, 992-993 [83 Cal.Rptr. 851], and *People v. Cruz* (1995) 38 Cal.App.4th 427, 431-433 [45 Cal.Rptr.2d 148], the defendants argued they could not be convicted of violating section 246, because they did not shoot "at" a building. In each case, the court concluded the evidence was sufficient to establish the intent to hit the building, because the defendant's actions were done with a reckless disregard of their probable consequences (*People v. Chavira, supra,* 3 Cal.App.3d at p. 993; *People v. Cruz, supra,* 38 Cal.App.4th at p. 433). The court in *Cruz* went a step further and concluded that section 246 does not require an intent to strike a building. (*People v. Cruz, supra,* at p. 433.) These cases concern that element of a violation of section 246 that requires a showing that a defendant unlawfully discharged a firearm at an inhabited dwelling, not that portion of the offense that requires that the act was done maliciously. The cases on which defendant relies do not create a new definition for the term "maliciously" as used in the statute.

Defendant also directs us to *People v. White* (1992) 4 Cal.App.4th 1299 [6 Cal.Rptr.2d 259]. The holding of that case is that section 246 is a crime of moral turpitude that may be used for purposes of impeachment. (*People v. White,* at p. 1301.) A person who shoots into an inhabited dwelling demonstrates wanton disregard for the life of those inside of it. (*Id.* at p. 1304.) This case does not alter the statutory definition of "maliciously" as used in section 246. ■ The trial court did not err in providing the standard CALJIC instruction on malice.

### C. *Self-defense.*

■ Defendant argues the court erred in failing to give the last paragraph of CALJIC No. 9.03.3, which reads as follows: "[The willful discharge of a firearm is not unlawful when done in lawful [self-defense] [or] [defense of others]. The People have the burden to prove that the discharge of the firearm was not in lawful [self-defense] [or] [defense of others]. If you have a reasonable doubt that the discharge of the firearm was unlawful, you must find defendant not guilty.]" Defendant argues the court had a sua sponte duty to give this part of the instruction, because the defense amounts to a claim that "defendant acted without forming the mental state necessary to make his or her actions a crime."

For the sake of our analysis, we shall assume defendant's claim that the court should have given the last paragraph of CALJIC No. 9.03.3 is correct.

Based on this record, and for the reasons that follow, we conclude any error in failing to instruct the jury on self-defense, as it related to the section 246 offense, was harmless beyond a reasonable doubt, that is, "the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [113 S.Ct. 2078, 2081, 124 L.Ed.2d 182, 189].)

### 1. *Lawful self-defense.*

The jury rejected defendant's claim of perfect, or lawful, self-defense. The jury, after receiving appropriate jury instructions on perfect and imperfect self-defense as those defenses related to the charge of second degree murder, concluded that defendant was guilty of voluntary manslaughter. Had they found that defendant had acted in perfect self-defense, they would not have found him guilty of voluntary manslaughter.

The identical facts giving rise to the murder charge form the factual basis for the section 246 charge. We have assumed for the sake of argument that, even if the instruction had been given on identical facts, this jury could not have convicted defendant of voluntary manslaughter, necessarily rejecting his claim of self-defense, and then, by accepting the defense, acquit him of the section 246 charge. Thus, the failure to specifically point out that the instructions on perfect self-defense applied to the section 246 charge was harmless beyond a reasonable doubt.

### 2. *Imperfect self-defense.*

Defendant contends the court should have instructed sua sponte regarding the so-called defense of imperfect self-defense with respect to the section 246 charge. We shall conclude that the court had no sua sponte duty to so instruct.

"It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People v. St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390], quoted in *People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

This duty to instruct sua sponte applies to defenses that are not inconsistent with the defendant's theory of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903].)

However, "the court's obligation to instruct sua sponte extends only to those general principles of law 'closely and openly connected with the facts before the court.'" (*People v. Guzman* (1988) 45 Cal.3d 915, 952 [248 Cal.Rptr. 467, 755 P.2d 917].)

"[A] legal concept that has been referred to only infrequently, and then with 'inadequate elucidation,' cannot be considered a general principle of law such that a trial court must include it within jury instructions in the absence of a request." (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 126 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People v. Sekona, supra,* 27 Cal.App.4th at p. 451.)

Defendant's contention that the court had a sua sponte duty to instruct on the so-called defense of imperfect self-defense, with respect to the section 246 charge falters, because, as our Supreme Court has made clear, "[c]ontrary to the statement in [*People v. Wickersham* (1982) 32 Cal.3d 307, 329 [185 Cal.Rptr. 436, 650 P.2d 311]] 'unreasonable self-defense' is . . . not a true defense; rather it is a shorthand description of one form of voluntary manslaughter. And voluntary manslaughter, whether it arises from unreasonable self-defense or from a killing during a sudden quarrel or heat of passion, is not a defense but a crime; more precisely, it is a lesser offense included in the crime of murder. Accordingly, when a defendant is charged with murder the trial court's duty to instruct sua sponte, or on its own initiative, on unreasonable self-defense is the same as its duty to instruct on any other lesser included offense: this duty arises whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense. [¶] We therefore disapprove *Wickersham*'s inaccurate assertion that 'unreasonable self-defense' is a 'defense.' (*Wickersham, supra,* 32 Cal.3d at p. 329.)" (*People v. Barton* (1995) 12 Cal.4th 186, 200-201 [47 Cal.Rptr.2d 569, 906 P.2d 531].)

At the time of trial, as now, no authority suggests that the nondefense of imperfect, or unreasonable, self-defense could apply in a prosecution for violation of section 246. Such a legal theory would be at odds with *Barton*'s characterization of unreasonable self-defense as a species of voluntary manslaughter. Because there was no authority supporting application of unreasonable self-defense to a prosecution for violation of section 246, that theory of defense could not be considered "a general principle of law" that was "openly connected with the facts before the court," and the trial court had no duty to instruct on that theory sua sponte. (*People v. Bacigalupo, supra,* 1 Cal.4th at p. 126.) Defendant's contention that the trial court had such a sua sponte duty to instruct is without merit.

### D. *Mistake of fact.*

 Defendant argues that the trial court, on its own motion, should have given the "mistake of fact [CALJIC No. 4.35] instruction[] . . . with respect to the charge of shooting into an inhabited dwelling." We disagree.

 In addition to its general duty to instruct on the law, the court " 'has the correlative duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." [Citation.]' " (*People v. Barker* (2001) 91 Cal.App.4th 1166, 1172 [111 Cal.Rptr.2d 403].)

CALJIC No. 4.35 provides: "An act committed or an omission made in ignorance or by reason of a mistake of fact which disproves any criminal intent is not a crime. [¶] Thus a person is not guilty of a crime if [he] [she] commits an act or omits to act under an actual [and reasonable] belief in the existence of certain facts and circumstances which, if true, would make the act or omission lawful." As applied to the facts of this case, this instruction would have been confusing and misleading.

 Even if defendant had been reasonably mistaken about the fact Lee had a gun, that mistake alone would not have relieved him of criminal liability. The instructions given to the jury in connection with the murder charge and the instructions on self-defense and imperfect self-defense required the jury to consider and resolve defendant's claims of mistake of fact. The impact of the defendant's actual and reasonable belief, even if it was mistaken, was fully described by CALJIC Nos. 5.12, 5.13, 5.30, and 5.51. The jury rejected defendant's proffered "reasonable" mistake concerning his need to defend himself. An unreasonable mistake provided him with no defense to the section 246 charge. The court thus had no sua sponte duty to provide a separate mistake-of-fact instruction.

### II

### *Section 12022.53 Enhancements*

 Defendant argues "the [L]egislature did not intend for the life term enhancement [section 12022.53] to apply in cases such as this where the shooting [at an inhabited dwelling in violation of section 246] was done in self-defense, perfect or imperfect." He further argues that the trial court erred when it failed to instruct the jury that the section 12022.53 enhancements would not apply if the defendant had acted in self-defense. He also

contends that the trial court should have instructed the jury that, as to the enhancement, the prosecution had the burden of proving he did not act in self-defense.

### A. *Application of section 12022.53.*

Defendant argues section 12022.53 is not applicable to a defendant who discharges a weapon at an inhabited dwelling in imperfect self-defense. We disagree.

■ "The touchstone of statutory interpretation is the probable intent of the Legislature. When interpreting a statute, we must ascertain legislative intent so as to effectuate the purpose of a particular law. Of course our first step in determining that intent is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citation.] When the words are clear and unambiguous, there is no need for statutory construction or resort to other indicia of legislative intent, such as legislative history. [Citation.] But language that appears unambiguous on its face may be shown to have a latent ambiguity; if so, a court may turn to customary rules of statutory construction or legislative history for guidance." (*Quarterman v. Kefauver* (1997) 55 Cal.App.4th 1366, 1371 [64 Cal.Rptr.2d 741].)

■ The language of section 12022.53, subdivision (*l*) is clear. It states: "The enhancements specified in this section shall not apply to the lawful use or discharge of a firearm by a public officer, as provided in Section 196, or by any person in lawful self-defense, lawful defense of another, or lawful defense of property, as provided in Sections 197, 198, and 198.5." (§ 12022.53, subd. (*l*).) This subdivision, on its face, exempts lawful (perfect) self-defense from the section's application. It does not exempt imperfect self-defense.

Defendant traces the history of Assembly Bill No. 4 (1997-1998 Reg. Sess.), which was ultimately enacted as section 12022.53. (Stats. 1997, ch. 503, § 3.) In its original version, Assembly Bill No. 4 applied to manslaughter, and set forth no exemption for self-defense. (Assem. Bill No. 4 (1997-1998 Reg. Sess.) as introduced Dec. 2, 1996.) The bill was amended on February 19, 1997, to include an exemption to its application for lawful self-defense. (Assem. Amend. to Assem. Bill No. 4 (1997-1998 Reg. Sess.) Feb. 19, 1997.)

Thereafter, an Assembly committee report, which discusses the amended bill, noted that the bill, as written, would apply the provisions of the new law where the charge of voluntary manslaughter was the result of a jury finding

that a defendant had killed another while acting in "imperfect self-defense." (Assem. Com. on Public Safety, Assem. Bill No. 4 (1997-1998 Reg. Sess.) Apr. 8, 1997.) That same report also noted that as written, the law "could also apply in homicides committed by battered wives, as an intentional killing done in response to non-imminent danger is, at least, manslaughter." (*Ibid.*) Finally, the report concluded that the bill, as written, "could also apply where a shopkeeper who uses deadly force in the honest belief that a person had come into his shop to rob and kill him or her." (*Ibid.*)

Following that report, the bill was amended to include imperfect self-defense. (Assem. Amend. to Assem. Bill No, 4 (1997-1998 Reg. Sess.) Apr. 9, 1997.) After a number of other amendments that shed no light on this subject, the Senate amended Assembly Bill No. 4 to exclude from its provisions the crime of voluntary manslaughter and the concept of imperfect self-defense. (Sen. Amend. to Assem. Bill No. 4 (1997-1998 Reg. Sess.) Sept. 20, 1997.) Curiously, because perfect self-defense operates as a complete defense to the underlying crime so that there would be no conviction to which the enhancement would attach if the defense were established, the bill continued the exception for lawful self-defense. But it also continued to provide that the enhancement applied to those convicted of a violation of section 246.

From the legislative history, defendant concludes that the Legislature never intended for the enhancement to apply to people who commit the qualifying crime while acting in either lawful (perfect), *or* unlawful (i.e., imperfect), self-defense. On the first point we agree; the statute expressly, if perhaps unnecessarily, provides that self-defense prevents application of the enhancement. As to the second point, the legislative history demonstrates that the Legislature was acutely aware of the interplay between manslaughter and imperfect self-defense. The Legislature's use of perfect and imperfect self-defense in the various versions of the statute demonstrates it knew how to include and exclude these concepts when it so chose. If the Legislature did not want the statute to apply in those cases where a defendant committed a violation of section 246 while acting with an actual, but unreasonable, belief in the need to defend himself, it was capable of writing the statute to say so. It did not. We will not rewrite this statute to include that which the Legislature chose to leave out.

B. *Failure to instruct the jury that lawful self-defense applies to the enhancements.*

Defendant argues the lack of a specific instruction that perfect self-defense is a defense to the enhancement and that the prosecution was

required to prove he did not act in self-defense requires reversal. Again, we disagree.

The jury rejected defendant's claim of perfect self-defense. If it had not, defendant would have been acquitted of all charges and the enhancement by necessity would not have applied. Thus, any instructional error on the point was harmless beyond a reasonable doubt.

### III

*Cruel and Unusual Punishment*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Sims, Acting P. J., and Morrison, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 23, 2002. Kennard, J., was of the opinion that the petition should be granted.

---

\*See footnote, *ante*, page 866.