Filed 3/30/15  P. v. Mullennix CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KENNETH DOYLE MULLENNIX,<br><br>        Defendant and Appellant. | A135983<br><br>(Sonoma County<br> Super. Ct. No. SCR576368) |

After a trial, a jury found defendant Kenneth Doyle Mullennix guilty of voluntary manslaughter of his wife Buapha ("Bua") Mullennix (Pen. Code, § 192, subd. (a)[1]), together with a related true finding that he personally used a firearm during the commission of the crime (§ 12022.5, subdivision (a)).  The court sentenced defendant to an aggregate term of 10 years in state prison, consisting of a term of six years for the voluntary manslaughter conviction and a consecutive term of four years for the firearm use enhancement. [2]  Defendant contends the trial court committed prejudicial instructional errors affecting the jury's consideration of perfect, or lawful, defense of others and evidence of uncharged domestic violence.  We conclude defendant's contentions do not require reversal, and accordingly, we affirm the judgment.

---

[1]     All further unspecified statutory references are to the Penal Code.

[2]     Before trial, defendant pleaded no contest to possessing an assault weapon with a detachable magazine (§ 12280, subd. (b)), as alleged in count two of the information.  He was sentenced to a concurrent term of two years.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Shortly after 10:00 p.m. on January 9, 2010, Petaluma police officers came to defendant's home in response to his 911 call in which he said his wife had tried to attack him, she was insane, and he shot and killed her. When the police arrived, defendant was standing in the doorway of the residence with a telephone in his hand. Following an officer's instructions, defendant put down the telephone and lifted up his shirt so the officer could check for weapons. Defendant was ultimately handcuffed, arrested, and placed in a patrol car and taken to the police department.[3] In response to the officers' requests through a public announcement system, defendant's then 10-year-old daughter and then 18-year-old stepdaughter, came out of the house and were ultimately taken to a children's center.

When the police entered the residence, they found the wife lying on the floor in the master bedroom, which was located on the second floor; there were two other bedrooms on that floor. There was a large wound on the right side of her face and a pool of blood around her head. The paramedics at the scene pronounced her death. An autopsy showed the wife had died from a gunshot wound to her head; she had no other injuries such as cuts, bruises, or rib fractures. A toxicology report of her blood came back negative for alcohol and therapeutic prescription drugs in an upper range. The condition of the body suggested the wife, when shot, had been standing up and the muzzle of the gun was fired from a distance of at least 12 to 30 inches from her face; the path of the bullet was straight from front to back of the skull and the wife died within seconds. The wife's hands tested positive for the presence of gun shot residue. However, it was not possible to tell whether she had fired a gun, was in close proximity to a gun

---

[3] When he was initially arrested defendant did not show any sign that he was under the influence of alcohol. About two hours after he had arrived at the police department, defendant was tested to determine his blood-alcohol level. Defendant's initial test results showed a blood-alcohol level of 0.235 percent. Unless defendant was an alcoholic, the result would be considered a high blood-alcohol level. Several hours later, defendant's blood-alcohol level was found to be 0.14 percent. Evidence was presented that when a person consumed too much alcohol, it was possible that signs of mental impairment of some degree could be present before outward signs of physical impairment.

2

that was fired by someone else, or came into contact with a source of gunshot residue particles. Although defendant's hands were also processed for the presence of gun shot residue, there was no analysis done of his sample.

The police searched the master bedroom, which included an area with a bed, two nightstands, a walk-in closet, a large dresser, and an alcove office area with a desk, a desk chair, and a bookcase next to the desk. The wife's body was found between the bedroom area and the alcove office area, with her head pointed to the bedroom area and her feet pointed toward the alcove office area. The police found a Glock pistol on the desk chair about six or seven feet from the wife and a spent shell casing underneath the bookshelf about two feet from the chair. The spent shell casing came from the Glock pistol, which was loaded and ready to be fired by pulling the trigger; no comparison could be made between the bullet found in the wife and a test-fired bullet. It was not possible to calculate from where the gun was fired based on the location of the spent shell casing. No usable latent fingerprints were found on the gun, its magazine, or the spent shell casing, which was not unusual given the gun's surface irregularities and the use of oil or polish.

The prosecution's trial theory that defendant had committed murder was based, in pertinent part, on varying statements defendant gave to the police, statements given by his stepdaughter and his sister-in-law, the physical evidence at the crime scene, and the position and condition of the wife's body when found by the police. The prosecutor also presented evidence showing that several months before the shooting sometime in the summer of 2009, defendant learned his wife was having an affair with another man, he was angry about the situation and wanted a divorce, and his wife had written a note indicating that on October 3, 2009, defendant had been drinking, grabbed her throat "too" tightly and pointed a gun at her. According to the prosecutor, on the day of the shooting defendant had been drinking and was angry with his wife. During an argument with his wife in the master bedroom, he could have walked out of the bedroom but chose to get his Glock pistol that was hidden in a bookshelf and shot her from a distance of one to three feet away. The prosecutor argued the evidence did not support defense theories that

3

the shooting was an accident, that the wife shot herself, or that defendant had acted in perfect self-defense or unreasonable self-defense or defense of others. Even assuming, the prosecutor theorized, wife had armed herself with the pistol, the physical evidence demonstrated that defendant had disarmed her, thereby ending his right to use deadly force against her to defend himself and the children who were elsewhere in the house.

In his defense, defendant presented evidence concerning wife's history of mental health treatment and her threatening, assaultive and violent conduct against defendant and her daughters, his placement of a GPS device on wife's car to track her whereabouts, his previous confrontations with wife regarding her affair with another man and his plans to divorce her, his drinking pattern and blood alcohol levels on the night of the shooting, and wife's knowledge of guns and the status of the Glock gun in the house on the night of the shooting.

Defendant also presented evidence regarding the events in the house on the night of the shooting. Defendant and his daughters were in the house when the wife arrived home at about 9:00 p.m. He had been drinking "quite a bit" and he went to the master bedroom because he was upset and angry and wanted to avoid a fight with his wife who was angry. He tried to read but he was too drunk and dozed off. His daughter came into the room and read to him. Wife came into the room and stood at the foot of the bed, glaring angrily at him and their daughter. Because it looked like his wife wanted to argue, defendant told his daughter that it was time for bed. The daughter said she did not want to leave and her mother got angry and started to yell at her. The daughter became upset and stormed out of the room and went to her own bedroom. Wife closed the door of the master bedroom. Defendant got off the bed and said he did not want to fight and just wanted to get some sleep. Wife began to call him names. He took off his clothes, paced back and forth, and said that wife should get out and leave the family alone. His wife responded, but defendant could not recall exactly what she said. The next thing he heard was his wife angrily saying, "I'm gonna kill you all" or "I'm gonna kill you, everyone." Defendant did not remember his wife saying to him, "I want you to die." He looked up and saw the Glock pistol in his wife's hand; she was holding it in her right

4

hand with her left hand holding her right wrist.[4] Defendant did not recall seeing his wife getting the gun, loading it, or readying it for firing. Defendant thought he reacted by saying something like he did not want to die. He did not recall saying to his wife, "I want you to die." Defendant was angry and scared for his wife, himself and the children. Unlike wife's earlier threats, this time defendant believed that his wife's threat "was direct, it was like, I'm gonna kill you, everyone, like it was something she was going to do right now." The next thing defendant remembered was seeing his wife lying dead with blood pouring out of her head. His ears were ringing from gunshot, and it smelled like gunpowder. He did not know what had happened; he was just in shock and felt horrible. He did not remember how his wife had secured the gun, how he got the gun, or how his wife was shot. At trial, he testified that it was possible the gun went off when he tried to take the gun away from his wife, "but [he was] taking responsibility."

Immediately before the shooting, defendant's stepdaughter was in her bedroom editing a video on her computer and defendant's daughter was in her separate bedroom listening to music. The daughters heard both parents arguing in the master bedroom. Despite wearing a headphone, the stepdaughter heard her mother and defendant yelling about her mother's boyfriend and divorce. The argument was loud and went on for a long time, and she heard defendant yell, "I want you to die." The daughters heard a loud noise. The stepdaughter took off her headphone and went toward the door of her bedroom. Before she opened the door and left her room she heard defendant say, "[Y]ou my wife, why you kill yourself." In the hallway, the stepdaughter saw defendant

---

[4]     Defendant had previously seen the Glock pistol several months earlier when he had hidden it in the master bedroom bookcase. After looking at a photograph, defendant identified the area of the bookcase where he had hidden the gun. He had not told his wife the location of the gun and he did not know whether his wife found the pistol or knew where it was after he had hidden it. Although the bookcase contained mostly defendant's books, it was also used by his wife for food packages and cards.

standing in front of the doorway to the master bedroom. Defendant said, "Don't go in there." [5]

Defendant further testified concerning the events after the shooting. He called 911 right away. When he was in the police car after his arrest, defendant was mumbling to himself that he did not remember if his wife had a weapon. Later that evening, when interviewd by the police, defendant only recalled going into the master bedroom, dozing off, and the next thing he remembered was his wife being dead. Defendant had a vague memory of his wife saying, "I'm gonna kill you," but he did not remember that his wife had a gun, his daughter had earlier come into the master bedroom, or his argument with his wife. Defendant recalled the forgotten incidents after seeing a picture drawn by his daughter. He told the police several times that he did not specifically remember shooting his wife but he must have done so because he could not imagine what else happened.

At the conclusion of evidence, the trial court instructed the jury on the charged offense of first-degree murder, and the lesser included offenses of second-degree murder, voluntary manslaughter (provocation, sudden quarrel/heat of passion, imperfect self-defense, imperfect defense of others), involuntary manslaughter, and justifiable homicide based on perfect, or lawful, self-defense. The jury was also instructed on related firearm sentence enhancements. The jury found defendant not guilty of first- or second-degree murder, guilty of voluntary manslaughter, and made a true finding that defendant personally used a firearm during the commission of the crime.

## DISCUSSION

### I. Trial Court's Refusal to Give an Instruction on Perfect or Lawful Defense of Others was not Prejudicial Error

In its final instructions, the trial court advised the jurors that in evaluating the circumstances of the crime, they could consider that defendant was not guilty of either murder or manslaughter if "he was justified in killing" the wife by acting in perfect or lawful self-defense. Specifically, the jury could acquit defendant if it found that

---

[5] Testifying after his stepdaughter, defendant either denied or did not remember making the statements that she said he made during the argument and after the shooting.

defendant "reasonably believed" he was in imminent danger of being killed or suffering great bodily injury, the immediate use of deadly force was necessary to defend against that danger, and he had used no more force than was reasonably necessary to defend against that danger. In determining whether defendant's beliefs were reasonable, the jury was advised to consider "all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed." However, the trial court denied defendant's request to allow the jury to consider whether the shooting was a justifiable homicide because defendant acted in perfect or lawful defense of others based on a lack of sufficient evidence to support the instruction.

On appeal the parties present extensive arguments addressing whether the trial court erred in refusing to instruct the jury on perfect or lawful defense of others. However, we need not address those arguments. Assuming the trial court should have given the requested instruction, defendant has failed to demonstrate prejudice requiring reversal on this ground.

Defendant argues the trial court's failure to instruct the jury on perfect or lawful defense of others is per se reversible error. However, he relies on lower federal appellate court decisions, which he concedes are not binding on this court. Alternatively, he argues we should apply the standard for federal constitutional error, which requires reversal unless the omission of the instruction is found harmless beyond a reasonable doubt in that there is no " 'reasonable possibility' " the error " 'might have contributed to the conviction.' " (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) As best we can tell, the Attorney General appears to argue that the omitted instruction was harmless regardless of whether we apply the standard for state trial court error as articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) (reversal required if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error), or the more stringent *Chapman* standard. As we now discuss, we conclude that any instructional error was harmless under either standard.

By finding the defendant guilty of manslaughter, the jury apparently found that defendant either acted in imperfect or unreasonable self-defense or defense of others, or was provoked by a sudden quarrel or heat of passion.  (*People v. Barton* (1995) 12 Cal.4th 186, 200-201.)  More significantly, and as defendant concedes in his reply brief, the jury necessarily rejected that he acted in perfect or lawful self-defense.  (*People v. Watie* (2002) 100 Cal.App.4th 866, 881.)  Defendant complains that if the jurors had been properly instructed on perfect or lawful defense of others, one or more jurors could have concluded that reasonable doubt existed about whether he killed his wife in defense of his children.  However, we see no merit to his speculative argument.  Specifically, he fails to explain on what basis the jury, having rejected his theory of perfect or lawful self-defense, would have credited a perfect or lawful defense of others theory.  The defense theories of perfect or lawful self-defense and defense of others were based on the same evidence  - defendant's testimony that the wife had armed herself and threatened to shoot him and the children and the shooting may have occurred as he attempted to take the gun away from his wife.  We cannot imagine the jury rejecting the defense theory of reasonable self-defense, but, then, relying on the same evidence, finding that he acted in reasonable defense of his children.  In other words, it is neither "reasonably possible" that the omitted instruction might have materially influenced the jury in arriving at its verdict (*Chapman, supra*, 386 U.S. at p. 24), nor "reasonably probable" that defendant would have obtained a more favorable outcome had the omitted instruction been given (*Watson, supra*, 46 Cal.2d at p. 836).  Thus, we conclude any instructional error relating to the theory of perfect or lawful defense of others was harmless.

## II.     CALCRIM NO. 852 Instruction Concerning Jury's Consideration of Evidence of Uncharged Domestic Violence was not Error

### A.     Relevant Facts

Before trial, the prosecutor filed a motion in limine seeking the admission of evidence of uncharged domestic violence committed by defendant against the wife in the form of a note purportedly written by the wife concerning certain events that occurred on October 3, 2009.  (Evid. Code, §§ 1109, 1250, 1370.)  Defendant opposed the request on

8

grounds of state law hearsay foundational requirements and as a violation of his federal and state constitutional rights of confrontation and due process. Over defendant's objection, the trial court granted the prosecutor's motion in limine and admitted into evidence the note during the testimony of the wife's friend. Wife's friend testified that sometime in January or February 2010, she found a note written in a spiral notebook in a vehicle formerly driven by the wife. In the note, dated October 3, 2009, the wife described events that purportedly occurred after the wife had slept downstairs the previous night and awoken that morning. When the wife went upstairs to find clothes to wear, she was confronted by a drunk and angry defendant. He grabbed her neck "too" tightly and she told him she could not breathe and he was hurting her. He also pointed a gun in her face. She asked defendant to put the gun down, told him he was drunk already, and, if not, she would call 911. During his trial testimony defendant denied committing the events described in the note. He also testified that, after reviewing the record of the GPS device that he had placed on his wife's truck, the date of his wife's note, October 3, 2009, was the day that he, his wife, and their daughters had gone on an all-day picnic and hike to Sugarloaf Ridge State Park.

In its final instructions, the trial court told the jurors to consider the evidence of uncharged domestic violence in the following manner: "The People presented evidence that the defendant may have committed domestic violence that was not charged in this case, specifically: grabbing Buapha around the neck and pointing a gun in her face. [<sup>6</sup>] [¶] *Domestic violence* means abuse committed against an adult who is a spouse. [¶] *Abuse* means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself

---

[6]    The current patterned CALCRIM No. 852 instruction suggests the following preamble sentence: "The People presented evidence that the defendant committed domestic violence that was not charged in this case[, specifically: _____<insert other domestic violence alleged>.]" (CALCRIM No. 852 (Fall 2014 ed.) p. 651.) In response to defendant's objection, the trial court modified the preamble language to read as it appears in the text of this opinion, advising the jury that "the People presented evidence that the defendant '*may have*' committed domestic violence . . . ."

9

or to someone else. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit Penal Code Section 187(a), Murder, as charged in Count I, or Penal Code, Section 192(a), Manslaughter, a lesser included offense to Count I. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Penal Code Section 187(a), Murder, as charged in Count I, or Penal Code Section 192(a), Manslaughter, a lesser included offense to Count I. The People must still prove the charge and each allegation beyond a reasonable doubt."

### B. Analysis

Defendant contends the CALCRIM No. 852 instruction, as given in this case, was argumentative and, in effect, an improper pinpoint instruction favorable to the prosecution. We disagree. CALCRIM No. 852 "does not merely pinpoint evidence the jury may consider. It tells the jury it may consider the evidence *but it is not sufficient by itself to prove guilt*. [Citation.] Defendant obviously does not quarrel with the emphasized language. If the court tells the jury that certain evidence is not alone sufficient to convict, it must necessarily inform the jury, either expressly or impliedly, that it may at least consider the evidence." (*People v. Kelly* (1992) 1 Cal.4th 495, 531-532 (*Kelly*) [Supreme Court upholding an instruction advising the jury as to how it was to consider specifically enumerated evidence demonstrating consciousness of guilt].) We

10

also reject defendant's related argument that the purportedly argumentative nature of CALCRIM No. 852 instruction either influenced the jury's evaluation of the uncharged domestic violence evidence specifically and all the evidence generally or indicated a bias on the part of the court in favor of the prosecution.

Referencing the first sentence in the CALCRIM No. 852 instruction that was given in this case, defendant argues the instruction created an impermissible burden-shifting presumption in favor of guilt. We disagree. The first sentence of the CALCRIM No. 852 instruction in this case set forth the evidence supporting the instruction. (*Kelly, supra*, 1 Cal.4th at p. 531.) Unlike the situation in *People v. Owens* (1994) 27 Cal.App.4th 1155, 1158-1159, cited by defendant, we see nothing in the language used in this case that suggests the trial court believed in the merits of prosecution's evidence of guilt, or otherwise "impermissibly slant[ed]" the determination of guilt or innocence on the charged crimes toward the prosecution, or "raise[d] an obvious inference that the prosecution had proved its case against" defendant. The court's CALCRIM No. 852 instruction in this case further advised the jury that "the evidence of uncharged acts of domestic violence may only be considered at all if it has been established by a preponderance of the evidence and explain[ed] what is meant by that burden of proof. The instruction also explain[ed] that if that burden is not met, the evidence must be disregarded entirely. [¶] . . . CALCRIM No. 852 explain[ed] that *if* the jury finds the defendant committed the uncharged acts, it *may* but is not required to conclude defendant was disposed to or inclined to commit domestic violence and may also conclude that the defendant was likely to commit and did commit the crimes charged in the case. . . . CALCRIM No. 852 clarifie[d] that even if the jury conclude[d] the defendant committed the uncharged acts, that evidence is only one factor to consider, along with all the other evidence and specifie[d] that such evidence alone is insufficient to prove defendant's guilt on the charged offenses. CALCRIM No. 852 then [went] on to state that the People must still prove each element of every charge beyond a reasonable doubt." (*People v. Reyes* (2008) 160 Cal.App.4th 246, 252.) "[N]othing in the instruction at issue authorized the jury to use preponderance of the evidence as the burden of proof on any

11

issue other than the preliminary determination whether the accused committed a previous [act of domestic violence].” (*Id*. at p. 253.)  Consequently, we reject defendant's argument “that a jury could reasonably interpret the instruction to authorize a guilty verdict . . . on the basis of a lowered standard of proof.” (*Ibid*.)

## DISPOSITION

The judgment is affirmed.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Pollak, J.