Filed 10/17/23  P. v. Pimentel CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARCO ANTONIO PIMENTEL,<br><br>Defendant and Appellant. | G062759<br><br>(Super. Ct. No. 16CR005361)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, Kawika Smith, Judge.  Affirmed.

Robert L.S. Angres for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General,  Arlene A. Sevidal, Randall D. Einhorn and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Appellant Marco Pimentel was convicted of second degree murder for shooting his wife, Deanna Medina. His identity as the shooter was not disputed. What was disputed was whether he had the requisite intent for first or second degree murder: malice aforethought.

Appellant asserted he could not remember anything about the shooting and did not intend to kill his wife. His expert testified that as a result of appellant's traumatic childhood and his substance abuse, he was in a dissociative state at the time of the shooting and was, for intent purposes, unconscious. The expert also testified that, owing to his heavy substance abuse both as an adolescent and as an adult, appellant's amnesia claim was credible and he was not faking it.

Appellant has identified two errors on appeal. First, he asserts the trial court gave prejudicially confusing and contradictory jury instructions regarding his expert witness. Second, he contends the court should have instructed the jury on the lesser included offense of involuntary manslaughter in the course of an assaultive felony. In his mind, the combined effect of these two errors prejudiced his constitutional rights to a fair trial, his third ground for reversal.

We affirm the judgment. The jury instructions were not contradictory. The jury was told it had to make its own evaluation of the truth of the percipient witnesses' testimony; it could not assume the expert's reliance on a witness' statement meant it was true. This is neither confusing nor contradictory. As to an instruction on involuntary manslaughter in the course of an assaultive felony, the jury determined appellant shot his wife with implied malice after having been instructed on involuntary manslaughter caused by intoxication. Having done so, the jury could not have found appellant guilty of involuntary manslaughter of any kind. The error, if error it was, was harmless.

**FACTS**

Appellant testified that his usual routine at the beginning of each day was to wash down some prescription pills (for which he had no prescription) with a pint of vodka before getting out of bed. Then, depending on how he was feeling at the time, he would shoot some heroin. If he did not shoot heroin at that time, he would do so later in the day. Appellant also testified that Medina herself routinely used methamphetamines. Both also drank alcohol. When appellant and Medina were under the influence, they would physically and verbally abuse each other.

Appellant shot Medina through the driver's side window as she sat in their car outside the house of a family friend, Crystal Castaneda. The bullet went through her left arm and entered her chest, piercing her lungs and her heart. She died within minutes. Appellant's role in causing Medina's death is not disputed.

On the day of the shooting, March 16, 2016, appellant testified he followed his usual morning routine with vodka and pills. He could not remember whether or when he shot heroin. He and Medina then set off to do some errands in their recently purchased Chevrolet Malibu. Initially he was driving, but Medina ordered him to turn off the road into a gas station because he was swerving. While at the gas station, Medina took the driver's seat, and appellant went into the station to purchase some 40-ounce beers.

That afternoon, appellant and Medina dropped in at the house of a friend, Jennifer Arcero, where appellant drank more vodka and had a margarita. He also drank "lean," which is cough syrup with codeine. From Arcero's house, Medina drove appellant to a court-mandated class, ironically a DUI class. When Medina and Arcero picked him up after class, he was holding another bottle of vodka. At this point, Arcero testified, appellant was "very, very drunk."

Later that evening, appellant appeared alone at the house of another friend, Crystal Castaneda. Castaneda has a son with appellant's cousin, Daniel Lopez, but the

3

two of them do not live together. Appellant asked Castaneda whether she had some marijuana and displayed a revolver to her.[1] Castaneda testified appellant was "really intoxicated, and goofy as he always was." "[H]e was never like sober ever." "You can tell by his demeanor, and how bloodshot red his eyes were that he was really gone." She could smell alcohol on him, and she believed he was also under the influence of meth and heroin. He was "upbeat, happy, smiling." When she walked him out of the house, she saw the Malibu parked in front of her garage, although she did not see Medina, who had remained in the car during the visit. Appellant then left the house.

Castaneda testified that she heard a gunshot shortly after appellant left. A few minutes later, appellant returned and informed Castaneda that he had "shot that bitch in the face." Castaneda understood him to mean Medina. He also said he had shot at the car and Medina had driven herself to the emergency room. Castaneda testified that appellant "looked shocked." Castaneda could not see the Malibu when she looked out of her front door or from her driveway, and at first she did not believe appellant. Appellant left again, and Castaneda returned to her house.

Castaneda then called Daniel Lopez and told him what appellant had said about shooting Medina. Her impression was that Daniel did not believe her, and she was likewise skeptical.

Appellant returned to Castaneda's house for the third time. At this point the car with Medina's body in it had been discovered and reported, and there was considerable police activity down the street from Castaneda's house. Castaneda told appellant Medina was dead in the car, but he acted as though he did not believe her. The police presence eventually convinced Castaneda that appellant had shot Medina.

---

[1]     Appellant testified that either he or Medina – sometimes both – carried guns whenever they left home. The guns belonged to his grandmother.

4

Appellant gave Castaneda the bullets from his gun, at her request[2] and again left. Castaneda believed he was still intoxicated, although he appeared "calm."

Appellant returned to Castaneda's house for a fourth time at around midnight or one in the morning, while the police were still processing the crime scene. He asked to stay the night, and she refused. She told him Medina was dead, and he responded he hadn't done it. He was carrying grocery bags that appeared to Castaneda to be full of trash and asked for cigarettes. He asked to put the trash bags inside the house but Castaneda told him to put them on the outside barbeque. She pushed some coins for cigarettes under the screen door. At that point, Castaneda did not want him to enter her house where her son was sleeping. She described appellant's condition during the night of March 16 as "like out of his mind. Like, he didn't know what was what. Like, he just seemed like he was lost."

Appellant asked Castaneda to call his grandmother Jeannie Pimentel. Appellant's grandmother picked him up and drove him to the residence of his cousin, Daniel Lopez, the father of Castaneda's son.

By this time, Daniel had taken a telephone call from Castaneda, and he knew Medina was dead and the police were looking for appellant as the shooter. He testified that appellant was drunk and stank badly of alcohol; Daniel convinced him to take a shower. While appellant was in the shower, Daniel put his clothing in a trash bag and threw the bag into the rafters of the garage.[3] He and appellant then took some pills provided by appellant's grandmother, lay down on the living room floor, and went to sleep. Police officers found them the next morning and arrested them both.

---

[2] At some point, Castaneda returned the bullets to appellant, but the record is unclear regarding when this happened.

[3] When police interviewed Daniel Lopez on the morning of March 17, the day after the shooting when both he and appellant were arrested, Daniel told the interviewing officer that appellant had put the clothing in the bag and thrown the bag onto the rafters. At trial, Daniel recanted this statement and insisted that he had done this without appellant's knowledge.

At trial, which got underway in September 2021, Castaneda testified twice about the night Medina was shot. Anna Lopez, appellant's mother, testified about the domestic violence and substance abuse appellant witnessed while growing up. Sabrina Gomez, appellant's sister, testified about the domestic violence she and appellant witnessed, their parents' substance abuse, and the violence inflicted on him while he was a child. Appellant himself testified about his substance abuse, starting at age 11 or 12 with alcohol and meth and graduating to daily use of heroin at the age of 14.[4] His father, a heroin addict, had introduced him to heroin, and they would shoot up together. He also explained that he had moved out of his mother's house at age 10 and lived with his grandmother Jeannie Pimentel who, he said, furnished him with alcohol and drugs. He said his grandmother and her husband also had a violent relationship.

Appellant claimed to have no memory of the relevant events of March 16, 2016. The last thing he remembered, he testified, was drinking "lean" in the afternoon at Arcero's house. The time after that was a blank until he found himself in the holding cell at Adelanto Detention Center, on the morning after the shooting. He did not even recall being interviewed by police after his arrest.

At trial, appellant's expert opined that the constant trauma of appellant's upbringing caused him to dissociate in times of stress or rage. He would be capable of action, even violent action, while unaware of his surroundings. His assertion he had no memory of shooting Medina was credible, and the expert believed he was not faking loss of memory. The expert testified that he formed his opinion based on statements made by Castanada about appellant's behavior during the night of the shooting, on the history of domestic violence and child abuse provided by appellant's mother, Anna Lopez, and his

---

[4] As teenagers, appellant and Castaneda "used to hang out every day." Appellant was, according to Castaneda "always drinking and smoking, and whatever else he'd do. When we used to hang out, that's all we did." '[We] used to do meth, smoke weed, and drink . . . [¶] [a]ll the time."

6

sister Sabrina Gomez, and on appellant's own statements during the expert's interviews with him.

Toward the end of trial, counsel and the trial court discussed jury instructions. One of the instructions discussed was CALCRIM No. 360.[5] After reading the text of the instruction, the judge stated, "That appears to me to be appropriate. Do either of you have a thought?" The prosecutor responded, "Agreeable." Defense counsel stated, "I think it's appropriate." The court and counsel then discussed the names that would be inserted in the space for the statements considered. Several names were suggested, and the court settled on seven names.

The jury found appellant guilty of second degree murder, as well as of three handgun enhancements. It acquitted him of first degree murder. He was sentenced to an indeterminate prison term for the murder with no parole eligibility for 15 years and to an indeterminate term for a gun enhancement with no parole eligibility for 25 years.

## DISCUSSION

### I.        Jury Instructions

Appellant's expert's opinion had two aspects. First, the expert opined that, due to a childhood disfigured by domestic violence and child abuse, appellant was in a dissociative state when he shot Medina. Dissociation is, in the expert's opinion, a mental defense mechanism that can be developed in childhood as a result of repeated trauma.[6] It is a way for the victim to flee the scene of the trauma mentally, even while bodily present. An adult, even though no longer subject to abuse, may enter a dissociative state if something "triggers" memories of the childhood abuse and the coping mechanism used at the time. In this state, a person's ability to form organized and rational thoughts and

---

[5]        CALCRIM No. 360 states, "<Insert name> testified that in reaching (his/her) conclusions as an expert witness, (he/she) considered [a] statement[s] made by  <insert name>. [I am referring only to the statement[s] <insert or describe statements admitted for this limited purpose>.]  You may consider (that/those) statement[s] only to evaluate the expert's opinion. Do not consider (that/those) statement[s] as proof that the information contained in the statement[s] is true."

[6]        "[D]issociation is typically connected with that repetitive exposure to nonlethal violence."

7

his or her awareness of behavior are impaired. Heavy use of alcohol and drugs would likewise impair consciousness.

The expert opined that appellant was in just such a dissociated state when he shot Medina. He was in a state of "impaired consciousness" and acting irrationally. The expert also opined that something Medina had said or done after appellant left Castaneda's house for the first time triggered him so that he became dissociated and shot her.[7]

The second aspect of the expert's opinion rested on appellant's use of drugs and alcohol, beginning in his childhood. Such abuse would also result in impaired consciousness. Furthermore, abuse of this kind could lead to blackouts, which appellant claimed he had frequently experienced. The expert opined that appellant's claim he could not remember the shooting was genuine, as demonstrated by his repeated inquiries about Medina's whereabouts after the incident and his repeated denials that he was responsible for her death.

While conceding that appellant had shot Medina, defense counsel argued extensively to the jury that appellant could not have formed the necessary intent for either first or second degree murder. Counsel based this argument in part on appellant's extreme intoxication on the night of the shooting and in part of the expert's testimony about appellant's traumatic childhood. Counsel argued for a verdict of manslaughter instead.

Aappellant now argues the court gave the jury confusing and contradictory instructions regarding how to evaluate the testimony of his expert. The court first instructed the jury, pursuant to CALCRIM No. 332, that "[a] witness was allowed to testify as an expert to give an opinion. You must consider the opinion, but . . . you are not required [to] accept it as true or correct. The experience [*sic*] and importance of any

---

[7] The expert referred to "reflexive outpouring of rage."

8

opinion are for you to decide.[8] In . . . evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training and education, the reasons the experts [*sic*] gave for any opinion, and facts or information on which the expert relied on in reaching that opinion. [¶] You must decide whether information on which . . . the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."[9] Shortly thereafter, pursuant to CALCRIM No. 360, the court instructed the jury that "[the expert] testified that in reaching his conclusions as an expert witness, he considered statements made by [appellant], Jeannie Pimentel, Anna Lopez, Joseph Lopez, Crystal Castaneda, Anna Marie Romo, and Sabrina Gomez.[10] You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true."

"'The appellate court may . . . review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby.' [Citations.] Instructional errors resulting in a miscarriage of justice violate the substantial rights of a defendant. [Citation.]" (*People v. Hudson* (2009) 175 Cal.App.4th 1025, 1028.) If the trial court's instructions in this case

---

[8] The written instruction that went into the jury room tracked CALCRIM No. 332 in stating that "[t]he *meaning* and importance of any opinion are for you to decide." (Italics added.)

[9] CALCRIM No. 332 states, in pertinent part, "(A witness was/Witnesses were) allowed to testify as [an] expert[s] and to give [an] opinion[s]. You must consider the opinion[s], but you are not required to accept (it/them) as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. [¶] You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

Counsel and the court did not discuss CALCRIM No. 332 during the discussion of instructions in which CALCRIM No. 360 was approved. The court later included CALCRIM No. 332 in a list of instructions it intended to give. Neither counsel objected.

[10] Two of the names put forward during the discussion of jury instructions were not included in the final instruction. Joseph Lopez appeared in the final instruction, but this name did not figure in the discussion of jury instructions.

9

confused the jury as to how to consider the expert's opinion – the core of the defense – then a miscarriage of justice would result.

In *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), on which appellant's analysis rests, the California Supreme Court addressed CALCRIM No. 332 and CALCRIM No. 360 in light of testimony from the prosecution's gang expert. (*Id.* at p. 671.) The detective testified he based his conclusion the defendant was a gang member on STEP notices, on his contacts with police while in the company of identified gang members, and on the fact the crime took place on gang turf.[11] (*Id.* at p. 673.) The defendant argue the expert's testimony regarding his past contacts with police was testimonial hearsay and its admission violated his constitutional right to confront and cross-examine witnesses. (*Id.* at p. 674.)

The court held that case-specific facts upon which an expert relies are hearsay, that is, out-of-court statements offered for their truth. If other competent proof of these case-specific facts has not been offered, then the jurors have no way of evaluating the facts for their truth, despite a jury instruction (CALCRIM No. 332) admonishing them to evaluate the information the expert relied on for its truth.

"The court also confusingly instructed the jury that the gang expert's testimony concerning 'the statements by the defendant, police reports, F.I. cards, STEP notices, and speaking to other officers or gang members' should not be considered 'proof that the information contained in those statements was true.' [CALCRIM No. 360.] Jurors cannot logically follow these conflicting instructions. They cannot decide whether the information relied on by the expert 'was true and accurate' [CALCRIM No. 332] without considering whether the specific evidence identified by the instruction, and upon which the expert based his opinion, was also true. 'To admit basis testimony for the

---

[11] Police officers issue STEP notices in accordance with the California Street Terrorism Enforcement and Prevention Act, Penal Code sections 186.20 et seq. They also prepare field identification cards (F.I. cards) recording an officer's contact with an individual. (*Sanchez, supra,* 63 Cal.4th at p. 672.)

10

nonhearsay purpose of jury evaluation of the experts is . . . to ignore the reality that jury evaluation of the expert requires a direct assessment of the truth of the expert's basis.' [Citations.] [¶] Once we recognize that the jury must consider expert basis testimony for its truth in order to evaluate the expert's opinion, hearsay and confrontation problems cannot be avoided by giving a limiting instruction that such testimony should not be considered for its truth. If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. [Fn. omitted.] Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Sanchez, supra,* 63 Cal.4th at p. 684.)

But there is a crucial difference between *Sanchez* and this case. In *Sanchez*, the gang expert relied for his opinion on case-specific out-of-court statements taken from the STEP notices and the F.I. cards, the authors of which did not testify. In this case, however, four of the seven people identified in CALCRIM No. 360 – appellant, his mother, his sister Sabrina Gomez, and Castaneda – did testify, and the case-specific facts to which they testified formed the bases of the expert's opinion. Three of these witnesses were appellant's own witnesses, thus obviating any concern about his right to cross-examination. The remaining witness, Castaneda, testified twice, once for the prosecution (subject to cross-examination) and once for appellant. The other three people listed in the

11

jury instruction did not testify, and, contrary to the instruction given, the expert did not testify that he based any of his opinions on statements made by them.[12]

Counsel and the trial court were very aware of *Sanchez* during trial, and the witness line-up was wisely structured accordingly.[13] Witnesses upon whose statements the expert relied testified before he did and gave in-court testimony about the case-specific factual basis of his opinion that appellant was severely intoxicated and in a dissociative state when he shot Medina. Appellant himself testified in court about his substance abuse and his claim that he could not remember the events before, during, and after the shooting, so the jury had a first-hand opportunity to evaluate the truth of his memory loss.

CALCRIM No. 332 and CALCRIM No. 360 are not contradictory in this context. CALCRIM No. 332 instructs the jurors that they had to decide whether to believe the witnesses whose testimony, given in court, underlay the expert's opinion. They had to decide whether this information was "true and accurate." CALCRIM No. 360 instructed the jurors that the fact that certain witnesses made statements to the expert was not proof that the statements were true. In other words, the jurors had to decide independently (per CALCRIM No. 332) whether to believe appellant, his mother, his

---

[12] At the end of a long trial, some confusion is probably to be expected. The expert testified to statements made by appellant *about* Jeannie Pimentel, appellant's grandmother, but he did not testify about any statements made *to* him by her concerning the sources of appellant's dissociation or substance abuse. Jeannie Pimentel did not testify. Joseph Lopez is Daniel Lopez's father and appellant's uncle. Apparently the court and counsel confused the two: Daniel testified; Joseph did not. The expert did not testify about any statements of case-specific facts made to him by Joseph. Finally, Anna Marie Romo's full name was not mentioned in court at all during testimony. An alert juror might have picked out the name Anna Marie from the list of the children of Anna Lopez, appellant's mother. But there was no testimony from the expert about statements made to him by Romo.
The expert testified that before trial he interviewed appellant, his mother, his sister Sabrina, his grandmother, and his father. He did not testify about any case-specific facts related to him by appellant's father.

[13] For example, at the motion in limine stage, defense counsel stated, "My understanding is that the People's motion would be on *Sanchez*. Would be to make sure that proper foundations are laid for case-specific hearsay, meaning if this is going to be evidence about, that [appellant] had a bad childhood and he suffers from PTSD, with disassociation, and that is rooted in childhood experiences, that [the expert] can't testify about for example, his conversations with [appellant's] family. [¶] We'd need to hear from [appellant's] family first to avoid *Sanchez* issues. That's my understanding of the *Sanchez* objection. I have no intention of putting [the expert] on before I put on the witnesses he spoke to that would lay the foundation. So that would take care of the *Sanchez* problem with respect to [the expert]."

sister, and Castaneda before they could evaluate an expert's opinion based on their statements. They could not simply assume that the expert's reliance on these witnesses' statements vouched for their truthfulness.

Appellant's somewhat convoluted argument is that the court confused the jury by instructing, on the one hand, that it "could not rely on the truth of the out-of-court statements made by appellant and various witnesses to assess the reliability of [the expert's] opinions" and also by instructing, on the other hand, that it "also could not rely on the in-court testimony of those persons to assess the reliability of [the expert's] opinion." Appellant continues, "[T]he jury did not understand that it could rely on the in-court testimony of the various witnesses named in [CALCRIM No. 360] in order for the jury to evaluate the factual basis for [the expert's] opinion." Appellant attributes "bewilderment" to the jury, as it was purportedly told "not to consider the information upon which [the expert] relied," and yet the expert also could not have relied on the in-court testimony of the percipient witnesses because he was not in court to hear it. Therefore, appellant argues, the jury could not correctly evaluate the expert's testimony about his intent or lack of it on the night of the shooting.

The record does not support this argument. The trial court did not instruct the jury that it could not rely on the in-court testimony of the percipient witnesses to evaluate the expert's opinion. It also did not instruct the jury that it could not rely on the truth of the out-of-court statements made by appellant and various witnesses. What the court said was that the expert's reliance on the out-of-court statements was not proof of their truth. As CALCRIM No. 332 instructed, the jury had to make an independent assessment of the truth and accuracy of the information on which the expert relied. If the jury found this testimony to be "true and accurate," then the expert could rely on these facts to form his opinion, the meaning and importance of which the jury also had to assess.

13

In this case, the "information on which the expert relied" was presented to the jury by means of the percipient witnesses' testimony. The jury was also instructed on witness credibility (CALCRIM No. 105) and told how to evaluate it. The court correctly instructed the jury as to how to decide whether the information on which the expert relied was true and accurate.

Appellant's confusion-of-the-jury argument assumes that the expert must glean his or her case-specific facts from hearing the percipient witnesses' testimony while sitting in the courtroom during trial. *Sanchez* sets out no such rule. *Sanchez* focuses on what the *jury* hears. The jurors must hear case-specific facts from competent witnesses, *whose credibility they can personally evaluate*. Then the jury decides whether to credit the expert's opinion based, in part, on whether the case-specific information on which it rests is "true and accurate." *Sanchez* puts no conditions on when or how the expert acquires this information so long as the jury has that opportunity to personally evaluate the credibility of the people who provided it.

The record undermines the confusion-of-the-jury argument in another way. During deliberations, the jurors asked nine questions. Among these questions were requests to read back appellant's testimony, Castaneda's testimony, and Arcero's testimony. Since appellant's identity as the shooter was not in question, the only reason to zero in on the testimony of these witnesses was to determine whether to believe the expert's opinion that appellant was in a dissociative state or unconscious on the day he shot Medina. The jury well understood that it could rely on in-court testimony from these witnesses to make this decision.

It is telling, we think, that appellant has not pointed us to a single instance of the expert's reliance on a purely out-of-court statement as the basis for his opinion, a reliance that would run afoul of *Sanchez*. Our survey of the record indicates that the expert stuck closely to the facts given during the prior testimony of the four witnesses when he explained how he arrived at his opinion. We do not think – and appellant does

14

not argue – that the mistaken inclusion of three names in the jury instruction of people who did not testify and upon whom the expert did not rely sufficiently confused the jury to prejudice appellant.

Because the trial court did not give erroneous, inconsistent, or confusing instructions to the jury regarding the expert's opinion, we need not address appellant's arguments about ineffective assistance of counsel, prejudice, or his constitutional rights in this regard.

## II. Involuntary Manslaughter

Pimentel now argues that the trial court should have instructed the jury on involuntary manslaughter during an inherently dangerous assaultive felony. The felony involved, according to appellant, was a violation of Penal Code section 246, which prohibits "maliciously and willfully" discharging a firearm into an occupied motor vehicle.[14] A violation of this section is a general intent crime. (*People v. Jischke* (1996) 51 Cal.App.4th 552, 556 ["[T]he question is whether the defendant intended to do the proscribed act."].) Appellant was not charged with a violation of section 246, and there was no mention or discussion of this code section during trial.

"'[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence [and] . . . an erroneous failure to instruct on a lesser included offense constitutes a denial of that right . . . .' [Citation.] However, a trial judge need not instruct the jury as to all lesser included offenses, just those that find substantial support in the evidence. [Citation.] ""'Substantial evidence" in this context is ""'evidence from which a jury composed of reasonable [persons] could . . . conclude[]

---

[14] The Penal Code defines "willfully" as implying "a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage." "Maliciously" is defined as "a wish to vex, annoy, or injure another person or an intent to do a wrongful act, established either by proof or presumption of law." (Pen. Code, § 7, subds. 1, 4.)

One can imagine defense counsel's reaction to a suggestion that the court instruct on a lesser included manslaughter offense that included willfulness and malice as elements after he had labored so strenuously to convince the jury appellant had been unconscious when he shot his wife.

15

""that the lesser offense, *but not the greater,* was committed.' [Citation.]" (*People v. Haley* (2004) 34 Cal.4th 283, 312, italics added.)

Appellant argues that the assaultive felony manslaughter instruction was necessary because if the jury did not believe him to be unconscious when he shot Medina, it then had no alternative but to find him guilty of murder in either the first or the second degree. An instruction on this alternative theory of manslaughter would have allowed it to find that he did not have the requisite intent even if he was conscious at the time of the shooting.

It is not true that the sole choice presented to the jury was either murder in one degree or the other or involuntary manslaughter while intoxicated. The trial court also instructed the jury on voluntary manslaughter, and defense counsel argued to the jury that appellant was provoked. "Something went down" or "something happened" between appellant and Medina after he left Castaneda's house the first time to set him off.[15] Unlike the instruction appellant argues for now, this theory did no violence to the dissociation theme at the heart of the defense.

The trial court instructed the jury regarding voluntary intoxication and the lesser included offense of involuntary manslaughter committed while voluntarily intoxicated.[16] The jury was instructed that among the elements of involuntary

___

[15]    Appellant's expert testified that, in his opinion, "something traumatic" between appellant and Medina at the time of the shooting "set off the dissociation."

[16]    CALCRIM No. 626 provides, "Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions. [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter. [¶] Involuntary manslaughter has been proved if you find beyond a reasonable doubt that: [¶]  1. The defendant killed without legal justification or excuse; [¶]  2. The defendant did not act with the intent to kill; [¶  3. The defendant did not act with a conscious disregard for human life; AND [¶]  4. As a result of voluntary intoxication, the defendant was not conscious of (his/her) actions or the nature of those actions. [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of (murder/ [or] voluntary manslaughter)."

16

manslaughter were the lack of an intent to kill and not acting with a conscious disregard for human life.

The court also instructed the jury on second degree murder.[17]  One of the elements of second degree murder is a conscious disregard for human life.   By convicting appellant of second degree murder after having been instructed on involuntary manslaughter, the jury must necessarily have decided he deliberately acted with conscious disregard for human life.

The verdict thus shows that any error in the involuntary manslaughter instructions was harmless because even if there was evidence that appellant consciously intended to shoot into the car merely to vex, annoy, or injure Medina, the jury was convinced beyond a reasonable doubt that the elements of the greater offense were proven.  (See *People v. Lee* (1999) 20 Cal.4th 47, 60-66 [lack of any instructions on the misdemeanor manslaughter theory of involuntary manslaughter was harmless error because the jury determined the defendant acted with malice]; cf. *People v. Coddington* (2000) 23 Cal.4th 529, 593, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [trial court's error in failing to instruct on second degree implied malice murder deemed harmless where the jury found the defendant's killings were premeditated]; *People v. Haley, supra¸* 34 Cal.4th at p. 314 [jury's guilty verdict on burglary and robbery rejected voluntary intoxication negation of specific intent]; *People v. Lewis* (2001) 25 Cal.4th 610, 646 ["Error in failing to instruct the jury on a lesser

---

[17]  "I will also instruct you on the different types of murder.  The defendant is charged with murder in violation of Penal Code Section 187.  To prove the defendant is guilty of this crime, the People must prove that, one, the defendant committed an act that caused the death of another person, and, two, when the defendant acted, he had a state of mind called malice aforethought.  There's two kinds of malice aforethought, express malice and implied malice.  Proof of either is sufficient to establish the state of mind required for murder.  The defendant had express malice if he unlawfully intended to kill.  The defendant had implied malice if, one, he intentionally committed the act.  Two, the natural and probable consequence of the act were dangerous to human life.  Three, at the time he acted, he knew his act was dangerous to human life.  And, four, he deliberately acted with conscious disregard for human life. . . .  [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the killing was a first-degree murder rather than a lesser crime.  If the People have not met this burden, you must find the defendant not guilty of first-degree murder, and the murder is second-degree murder."

included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instruction adversely to defendant under other properly given instructions."].)

An element of this kind of manslaughter – as of the intoxication kind on which the jury was instructed – is that the defendant did not act with a conscious disregard for human life. (See *People v. Odell* (2023) 92 Cal.App.5th 307, 321 ["The difference between other homicide offenses and involuntary manslaughter depends on whether [the defendant] was aware of the risk to life that his actions created and consciously disregarded that risk."].) The jury in this case determined that appellant was guilty of second degree murder; it must therefore have determined, pursuant to the jury instruction on murder – which appellant does not challenge – that he knew shooting Medina was dangerous and that he had deliberately acted with conscious disregard for human life. Having done so, the jury could not have found him guilty of involuntary manslaughter of any description. (*People v. Bryant* (2013) 56 Cal.4th 959, 970 ["A defendant who has killed without malice in the commission of an inherently dangerous assaultive felony must have killed without either an intent to kill or a conscious disregard for life."]; Pen. Code, § 192, subd. (b).)[18]

We find nothing in the court's instructions to merit reversal.

---

[18] From the jury instructions: "I can accept a verdict of guilty or not guilty of voluntary or involuntary manslaughter only if all of you have found the defendant not guilty of both first- and second-degree murder."

## DISPOSITION

The judgment is affirmed.


                                        BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


SANCHEZ, J.